**CENTRAL FLORIDA NUCLEAR FREEZE CAMPAIGN and Bruce Gagnon, Plaintiffs-Appellants,**

v.

**Frederick J. WALSH, Chief of Police of Orlando, Florida, Defendant-Appellee.**

No. 84–3833.

United States Court of Appeals, Eleventh Circuit.

Nov. 4, 1985.

**1516**

Bruce Rogow, Fort Lauderdale, Fla., for plaintiffs-appellants.

Jody M. Litchford, Police Legal Advisor, Orlando Police Dept. Orlando, Fla., for defendant-appellee.

Before HENDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal of an order granting the defendants' motion for summary judgment, upholding an Orlando, Florida, ordinance which requires as a condition for the granting of a permit for persons wishing to use the public streets and parks for demonstrations, the prepayment of fees for additional police protection. For the reasons set forth herein, the Orlando city ordinance on its face, as well as the manner in which it was applied violates the First Amendment guarantees of freedom of speech and assembly of the United States Constitution made applicable to the states by the due process clause of the Fourteenth Amendment.

## I. BACKGROUND

The appellants, the Central Florida Nuclear Freeze Campaign, a non-profit antinuclear organization, and Bruce Gagnon, its coordinator, desired to conduct a parade and rally in Orlando, Florida on a Saturday in October, 1983 to communicate their views about the nuclear arms race. As required by the Orlando City Ordinances, 18A.10–11,[1] the appellants filed an application for a permit with the Chief of Police of Orlando to conduct their outdoor march and rally. The application estimated that 1,000 people would participate in a nine-hour rally and approximately 700 to 800 marchers in a two and one-half hour parade. It is clear that the term "assembly" in the code applies to both parades and rallies. The proposed parade route covered approximately four miles through major thoroughfares and ending at "Tinker Field," an Orlando recreation area, where the rally would be conducted.

Before a permit can be issued, Section 18A.12[2] of the Orlando City Ordinance re-

---

1. Section 18A. 10(1) of the Orlando City Ordinance provides:

   (1) No person shall advertise, engage in, participate in, and, form or start any outdoor public assembly unless an outdoor public assembly permit shall first have been obtained from the Chief of Police.

   Section 18A. 11 of the Orlando City Ordinance governs the application requirements for outdoor public assembly permits and states that "Any person seeking the issuance of an outdoor public assembly permit shall file an application with the Chief of Police on the forms provided by the Chief of Police." It further designates the categories of information required, as well as the filing period.

2. Section 18A. 12 of the Orlando Code provides:

   After obtaining as much information as the chief of police reasonably deems necessary regarding a permit application, he shall determine whether and to what extent additional police protection reasonably will be required for the assembly for purposes of traffic and crowd control. In making such a determination, the chief of police shall consider such factors as the size, location and nature of the assembly. If additional police protection for the assembly reasonably is deemed necessary by the chief of police, he shall so inform the applicant for the permit. The applicant then shall have the duty to secure police protection reasonably acceptable to the chief of police at the sole expense of the applicant and shall prepay the expenses of such protection.

quires the Chief of Police to "determine whether and to what extent additional police protection reasonably will be required for purposes of traffic and crowd control." In determining whether additional police protection is required, the Code requires the Chief of Police to consider such factors as the size, location and nature of the assembly and if additional police protection is then warranted, the applicant has the duty of prepaying the expenses as a condition of the issuance of the permit.

Pursuant to this Ordinance, the city determined that 18 additional officers would be needed to police the nuclear freeze march and three additional officers were needed to police the appellants' rally. The city based its decision on a number of factors including its belief that due to the controversial nature of the rally and the location of the Martin Marietta plant, a major defense manufacturer and a large local employer in Orlando,[3] the potential for hostile counter activity existed which necessitated the need for additional police protection. The City's decision was also based on the expectation that the rally and parade would draw many non-local participants who, based on past police experience, the City concluded would be more likely to cause disorder than would local residents.[4] The cost of this additional police protection totaled $1,435.74 ($1,202.64 to compensate police working the parade and $233.10 for the rally.) This amount was computed on the basis of what it would cost to pay police officers to work off duty at the rate of one and one-half pay at the regular hourly rate by working on the day of the event which was a non-workday.[5] Because

3. The following colloquies from Deputy Chief Walsh's deposition explain the City's concern about the presence of the Martin Marietta Plant and the possibility of hostile counter demonstrators:

Q. I understand. In the Nuclear Freeze application, looking at the answers to interrogatories, apparently at some level there was some of this concern also put into the process because one of the things that is said here is whether participants were local or out of town, whether the participants were going to bring counterdemonstration, so at the Nuclear Freeze there was some concern at some level that they would draw counterdemonstrators?

A. I am sure there was, yes.

Q. In fact, one of the other statements made in the interrogatories that you prepared the answers to, I understand,—

A. Uh-huh.

Q. —is that due to the controversial nature of the rally and close location to the Martin Marietta plant the plan of hostile counteractivity was considered.

A. That was considered.

Q. You used the extreme of the plan in the black community, but the same thing could enter into the permit process, spectacular kind of event; is that correct?

A. That is correct. May I elaborate on that?

Q. Just one thing again for the record. Even I don't know what the Martin Marietta plant does that has relevance to this. In your answer you said due to the controversial nature of the rally, meaning Nuclear Freeze rally, and the close location of the Martin Marietta plant in Orlando. There is obviously a connection, but I don't know what it is. Do they manufacture nuclear—

A. No, but they are a major defense manufacturer and it is my understanding that they make military missile systems, as I understand.

Q. The concern was in fact employees to Martin Marietta might find that as a threat to their jobs in Orlando?

A. Yes, sir, that was a concern.

4. In determining the need for additional police protection for the Central Florida Nuclear Freeze Campaign parade, the City asserts that it also considered the proposed length and route of the parade, potential need to re-route traffic, close streets and control traffic at intersections, the estimated number of participants, type and function of the parade, number of volunteers to be provided for self-policing the event and the time of day and date of the parade.

The criteria in determining the protection for the rally also included the total number of persons expected to attend, whether alcoholic beverages would be sold or consumed, whether entertainment would be provided; the type and function of the event, the location of the event and the nature of the physical facilities provided, i.e., lighting, seating, entrances and exits; and the need for traffic control and parking assistance.

5. Pursuant to agreement between the City of Orlando and the Orange County Police Benevolent Association, Inc., officers ordered to work in excess of 40 hours in a seven day work week must be paid at the rate of one and one-half hours at the regular hourly rate. The total amount required for the parade was $1,202.64. Of this amount, 14 motor officers would be paid

the event was to take place on Saturday, the fee charged to the appellant for payment of police protection was computed on this overtime pay basis.

Prior to the payment of this fee, the appellants filed a complaint in the United States District Court, seeking declaratory and injunctive relief against the enforcement of Section 18A.12 of the Orlando City Ordinance alleging that conditioning the exercise of First Amendment rights upon the payment of a "substantial" and "unreasonable" fee placed an insurmountable burden on First Amendment's guarantee of freedom of speech and assembly and violated the equal protection component of the Fourteenth Amendment. The plaintiffs then moved for a preliminary injunction to require the issuance of the parade permit without payment of the fees.

The district court heard oral argument on the plaintiffs' motion for a preliminary injunction and denied the injunction, relying on the Supreme Court's decision in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The parties thereafter entered into a stipulation that the plaintiff would pay the sum of $1,435.74 under protest, as pre-payment for City of Orlando police services in connection with the plaintiff's parade and rally. The fee was paid and the defendant granted the plaintiffs permission to conduct the parade and rally. Subsequently, the parties filed motions for summary judgment to resolve the constitutionality of the statute.

## II. THE ISSUE

The parties stipulated that the issue "to be determined was whether the city's ordinance requiring the payment of a fee for additional police services violate the First Amendment on its face or as applied in this case."

## III. DISCUSSION

In the City's motion for summary judgment, the defendant claimed that the requirements of Orlando City Code Section 18A.12 requiring the payment of a fee to defray the costs of policing the event was constitutional under the Supreme Court's ruling in *Cox v. New Hampshire.*[6] Moreover, the defendant asserted that the ordinance was both reasonable and was related to legitimate government concerns as a valid time, place and manner restriction on the use of the public streets and that the license scheme in *Cox* is directly analogous to the ordinance scheme in the City of Orlando. It contends that the Orlando ordinance in question simply passes along the actual costs of policing the event and protecting the public safety to the event participants.

The defendant suggests that the Court in *Cox* did not limit the permissible fee to $300.00 and that relative dollar values should therefore be considered when comparing the $300.00 fee approved in *Cox* with the fee charged in the case at hand.

According to the defendant, other cases have cited *Cox* in approving fees designed to defray the actual expenses of administering a First Amendment activity. The defendant cites *Collins v. Smith*, 578 F.2d 1050, 1054 (2d Cir.1983) as citing *Cox* for the proposition that the government may impose financial burdens on the exercise of First Amendment rights when the amount involved is reasonable and directly related to legitimate government purposes.

In addressing the question of requiring the plaintiffs to pay overtime costs for

at a standard overtime rate of $15.54 per hour. Two sergeants would be employed to command the officers at a rate of $17.30 per hour, one lieutenant at $22.94 per hour and one captain at a rate of $25.38 per hour. The total amount required for the assembly was $233.10, employing three officers at $15.54 per hour.

**6.** In *Cox*, the Supreme Court upheld a New Hampshire statute that required demonstrators to obtain a license permit as a prerequisite to holding a parade on public streets and side-

walks. The statute also required demonstrators to pay a permit fee of not more than three hundred dollars for each day of the demonstration. In upholding the fee requirement, the Court said that because the state had imposed the charge to meet expenses incidental to the administration of the regulation and to costs of policing streets during a parade, the fees were valid. 312 U.S. at 577, 61 S.Ct. at 766.

The application of the holding of the *Cox* case to the Orlando ordinance in question will be discussed *infra*.

police protection, the defendant argued that the payment of overtime for all off-duty work was a reasonable way to insure that police will be able to work at public assemblies and that in this regard, it meets the *Cox* requirement that fees be reasonable and non-arbitrary.

The defendant also argued that it was not improper to consider the content of the speech in determining the level of police protection required. The consideration of whether an activity might create disorder was only one factor in assessing the police protection costs. Moreover, the defendant asserted that the Orlando ordinance does not allow the denial of a permit because of a perceived potential for disorder. "That potential is simply one element of the assembly which is considered along with several other factors in assessing whether additional police protection is warranted."

Lastly, the defendant concluded that in light of the interest in public safety, the requirements of City Code 18A.12 are not only reasonable but necessary to ensure that all persons are provided equal access to public forums.

In the cross-motion for summary judgment the plaintiffs alleged that: (1) a city could not condition the exercise of First Amendment rights upon payment of the full costs of additional police protection necessitated by the exercise of First Amendment rights and that costs charged must be narrowly tailored and reflect the least restrictive means of accomplishing the governmental purpose; (2) the Orlando ordinance was not applied in a content neutral narrowly tailored fashion, but in a manner which interfered with the plaintiff's First Amendment rights.

Specifically, the plaintiffs argue that the license fee charged for the police services was based partially on the content of its views. As evidence to support this claim, the plaintiffs refer to the deposition of deputy chief of police Frederick Walsh, who testified that in addition to the usual factors of traffic control and the size of the demonstration, the police were concerned with the possibilities of hostile counter demonstrators and the presence of out-of-town demonstrators.

It was the plaintiffs' contention that it was improper to force the plaintiffs to pay projected police costs of protecting themselves from being attacked by possible hostile counter demonstrators. To the extent that the fees charged the plaintiffs were based upon the hostile counter activity and based on the content of the plaintiffs' speech, the plaintiffs contended that "the Defendant charged them for the enjoyment of a right granted by the Federal Constitution" and that no case stands for the proposition that a demonstrator must pay the police to protect enjoyment of First Amendment rights from violence. Moreover, the plaintiffs argued that the defendants' consideration of the controversial nature of the plaintiffs' speech in determining what costs would be charged for the protection of that speech, constituted an impermissible restriction on the expression of speech.

Lastly, the plaintiffs argued that the City's concern in assessing the costs for protection was not solely based on the need for public safety, but partly on the concern for protecting the public fisc. The plaintiffs introduced deposition testimony of deputy chief Walsh who acknowledged that the City's concern was whether the general fund which subsidizes police services "to perform a certain function" should absorb costs or should it be absorbed by the people who are actually in the process of exercising their rights.[7] The plaintiffs contended

---

**7.** The following statements from Deputy Chief Walsh's deposition explaining the City's rationale for charging the demonstrators the cost of extra police protection:

Q. The question I have is why must the demonstrators pay for protection of the rights that it is your job to guarantee?
A. It has been our position on that issue that were it not for this particular demonstra-

tion, then the cost—the cost factor, which it boils down to an amount of dollars here, that the city would have expended would no longer be necessary. In other words, if the exercise—if the 18A permit were not granted and whatever happens there with that 18-A permit didn't happen, then there would be no potential for a violation of rights or for disorder or anything else, you

that the City's initial concern of public safety and protecting the public fisc goes beyond the holding of *Cox v. New Hampshire*'s concern for public safety. Alternatively, plaintiffs argued that if protection of the public fisc is considered a legitimate governmental concern then the ordinance fails to achieve those objectives by the least restrictive means available. It fails to differentiate between commercial speech and non-commercial speech and lumps together all expression without acknowledging the greater protection accorded to public issue expression. The plaintiffs argued that the City could have chosen the less restrictive means of pursuing its legitimate governmental interests by treating public issue communication as a part of its basic law enforcement duty and utilizing, whenever possible, regular police officers at straight hourly rates or utilizing reserve officers not benefited by the time and half pay, which would have reduced the costs for policing the event substantially. Thus, the plaintiffs argued there were alternative means of achieving the City's governmental concerns without charging public issue proponents the full costs of policing the event at the overtime rate of off-duty police officers.

The district court, without oral argument, entered a judgment for the City of Orlando holding the City ordinance to be facially valid and constitutionally applied. It rejected the plaintiffs' arguments that the decision to impose a fee for additional police protection was both content based and a prior restraint on the exercise of First Amendment freedoms. The district court stated that it was reasonable for the defendant to consider the ideas or policies being espoused by the license applicant in making a determination as to the quantity and quality of police protection needed to ensure an orderly parade or rally. This information, the court concluded, "was relied on in an objective, non-discriminatory fashion which comported with both common sense and the Constitution." In rejecting the plaintiffs' argument that consideration of possible hostile counter demonstration was forcing them to pay for the exercise of First Amendment rights, the court stated that "Chief Walsh properly and objectively considered the potential for counter demonstrations in calculating additional police requirements and the amount of the license fee was reasonably related to the expected costs."

The court also disagreed with the plaintiffs' argument that the Orlando ordinance lacked narrow, objective, and definite standards and gave the chief of police unbridled discretion to grant or deny a permit under the Supreme Court's holding in *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The district court noted that there were several provisions in the Orlando ordinance which limited the police chief's discretion so as to protect First Amendment rights. First, the Court interpreted the Orlando ordinance as implicitly requiring that fees charged as prepayment of certain reasonable costs expected to be created by the activity must bear a reasonable relationship to anticipated costs. Secondly, the ordinance provided for an expedited appeal to the council of a decision of the chief of police to deny a permit. Such an appeal would permit summary review of any adverse action by the chief of police resulting in a denial of the permit. These provisions, the Court stated "sufficiently restrict and channel the police chief's discretion so as to protect First Amendment rights." Additionally, the Court disregarded the argument that fees charged cannot be based on the notion of protecting the public fisc. The Court read *Cox* to rest in part on that justification. "Where the public activities of a specific person or group generate abnormal requirements for public protection to secure

see. So the reason that the potential exists is because of the events that is happening. So, the question then becomes one of should the taxpayer out of the tax base, the general fund which subsidizes police service to perform a certain function here in the city be—absorb that or should it be absorbed by the people that are actually in the process of exercising their rights. It is a

question where I certainly [am] not going to venture an opinion. I am only going to say the City's position has been one that those that obtain the permits underwrite the expense.

I am not trying to mislead you, sir, honest to God. I am trying to give you the—you know, straight from the shoulder.

Walsh Deposition, pp. 19–20.

the right of the general public to order and safety, *Cox* allows the cost thereof to be passed on to those whose activities occasion it. Although the City could choose to absorb the costs of all speech activity, nothing in the Constitution requires it to do so. *Cox, supra.*" Lastly, the court concluded that the doctrine of least restrictive means did not require the chief of police to utilize the least expensive way of providing the public protection. The defendant's decision to use active off-duty police, even at an overtime pay rate was not on its face a constitutional violation nor was it, in the Court's view, an unreasonable choice under the unique facts at hand.

## IV. THE DECISION

The issue raised by this appeal concerns the constitutionality of the Orlando ordinance 18A.2 which authorizes the chief of police to charge persons exercising First Amendment rights, the full cost of additional police protection, as a condition to the granting of a permit. The crucial concern here is the extent of the right of the public to use the city streets and parks, which the Supreme Court has regarded as quintessential public forums, to exercise First Amendment activity, without the imposition of pecuniary burdens which allegedly go beyond a municipality's concern of legitimate governmental interests. The appellant essentially raises two arguments with respect to the unconstitutionality of the Orlando ordinance: (1) a governmental entity may not charge a public issue commentator the full costs of all police services believed necessary for traffic and crowd control and for the protection of demonstrators from hostile citizens' attack; (2) if costs for additional police services can be passed on to First Amendment users of the public forum, then the Orlando ordinance fails to achieve that governmental purpose by the constitutional requirement of narrow, objective and definite standards and the least restrictive means of accomplishing the governmental purposes. Since the Orlando ordinance may not be applied in a content neutral way, nor in the least restrictive manner, the ordinance is unconstitutional.

We begin with the question to what extent and under what circumstances costs for additional police protection may be passed on to those wishing to demonstrate in a public forum as a pre-condition to the granting of a permit. At the outset, we note that the Supreme Court in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), approved a New Hampshire statute that required demonstrators to first obtain a license permit and the payment of a fee, as a pre-condition to those wishing to use the public streets and sidewalks to demonstrate. A group of Jehovah's Witnesses who were convicted for parading without a permit, challenged the statute on constitutional grounds as interfering with their First Amendment rights. In upholding the permit requirement, the court held that First Amendment rights were not threatened by a law regulating the time, place and manner of conducting a parade on the streets. The Court then considered the fee requirements in a single paragraph of the opinion:

There remain the question of license fees which, as the [state supreme] court said, had a permissible range from $300 to a nominal amount. The court construed the Act as requiring "a reasonable fixing of the amount of the fee." "The charge", said the court, "for a circus parade or a celebration process of length, each drawing crowds of observers, would take into account the greater public expense of policing the spectacle, compared with the slight expense of a less expansive and attractive parade or procession, to which the charge would be adjusted." The fee was held to be "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated. The suggestion that a flat fee should have been charged fails to take account of the difficulty of framing a fair schedule to meet all circumstances, and we perceive no constitutional ground for denying to local governments that

flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought.

312 U.S. at 576, 61 S.Ct. at 766. The Court therefore viewed the fee requirement as charges to meet expenses incidental to the administration of the regulation and the costs of policing the event. Although the Court did uphold the fee requirement, it is important to note that the Court did not touch on the reasonableness of the fees or how they could be fixed. Thus, important questions still remain about the application of *Cox* under modern constitutional doctrine. Importantly, the *Cox* Court did not address circumstances where persons who wish to demonstrate are unable to pay the required fee, nor did the Court concern itself with a statute which is unlimited in the amount of fees that can be charged as expenses, nor with the question whether the charge can be based, at least partially on the content of the speech.

However, two years after the *Cox* holding, the Supreme Court in *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), gave further clarification on the extent to which a municipality can charge fees as a prerequisite to the exercise of First Amendment rights in a public forum. In *Murdock*, the Court invalidated a city ordinance which as construed and applied, required distributors of religious literature to pay a flat license fee as a prerequisite to conducting their activities. In rejecting the fee as a license tax on the exercise of First Amendment rights, Justice Douglas, writing for the Court, stated: "It is a license tax—a flat fee imposed on the exercise of a privilege granted by the Bill of Rights. A State may not impose a charge for the enjoyment of a right granted by the Federal Constitution." 319 U.S. at 113, 63 S.Ct. at 875. Moreover, twice the Court observed that the fees imposed under the Pennsylvania ordinance were not nominal fees imposed as a regulatory measure to defray the expenses of policing the activities in question. Referring to *Cox*, the Court stated: "And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuse of solicitors. See *Cox v. New Hampshire* . . . ." 319 U.S. at 116–17, 63 S.Ct. at 876. The *Murdock* ruling therefore indicates that *Cox* should be read as authorizing a municipality's charging of fees for the use of the public streets only when such fees are both nominal and related to the expenses incidental to the policing of the event. The Supreme Court has not heard a First Amendment service charge case since *Murdock* in 1943 and as a consequence, there has been no further guidance by the Court on the application of the *Cox* rationale to the modern free speech cases. Importantly, however, the court has adopted a broad view on the public's right to the use of the streets and parks as quintessential public forums to further freedom of expression. In *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Court reaffirmed the public's guaranteed access to streets and parks, as public forums for purposes of assembly, communicating thoughts between citizens and discussing public questions. In *United States v. Grace*, the Court, in guaranteeing the right of members of the public to picket on public sidewalks outside of the Supreme Court building, stated:

"[P]ublic places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered without more, to be "public forums." *In such places, the government's ability to permissibly restrict expressive conduct is very limited:* the government may enforce reasonable time, place and manner regulations as long as the restrictions "are *content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.*" Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest.

461 U.S. at 177, 103 S.Ct. at 1706–07 (emphasis added).

There is no question here that the type of speech engaged in by the appellants, demonstrating through the public streets and conducting an assembly on the issue of nuclear arms is the type of speech which is constitutionally protected in the highest order. As this Court has stated, "certain types of speech traditionally are accorded greater protection in our society by virtue of the fact that the speech goes to the heart of the Democratic process." *Leonard v. City of Columbus,* 705 F.2d 1299 (11th Cir., 1983). The appellants' demonstration and march through the streets of the city of Orlando is "public issue speech which occupies the highest rung of the hierarchy of First Amendment values." *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Moreover, the places in which the appellants sought to exercise their First Amendment rights, the streets and parks, were quintessential public forums, "where the rights of the state to limit expressive activity are sharply circumscribed." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939).

Governmental limitations on the exercise of First Amendment rights in traditional public forums, are proper only when they are valid time, place and manner restrictions which are content-neutral, are narrowly tailored to serve significant governmental interests and leave open ample alternative channels of communication. *See, United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736; *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 673 (11th Cir.1984).

■ These limitations do not permit the imposition of unlimited charges for the costs of additional police protection based on the content of the speaker's views. Although license fees are proper for the costs of administering an event, under the Supreme Court's decision in *Cox v. New Hampshire,* we read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities. An ordinance which charges more than a nominal fee for using public forums for public issue speech, violates the First Amendment. We, therefore, hold that the Orlando City Ordinance 18A.12 which requires persons wishing to use city streets and parks to demonstrate, to prepay an amount of costs for additional police protection determined by the discretion of the chief of police is unconstitutional.

Such unrestricted discretion fails to require consideration of the purpose of the speech—commercial speech such as a circus parade compared to public advocacy concerning a political and social issue as here. Nor does it take into account the ability to pay by the applicant of the permit. Instead of weighing these factors, the chief of police chose to consider that some of the demonstrators were non-residents of Orlando, thus putting a premium on the enjoyment of the right of public speech and assembly on intrastate and interstate travelers.[8]

■ Moreover, indigent persons who wish to exercise their First Amendment rights of speech and assembly and as a consequence of the added costs of police protection, are unable to pay such costs, are denied an equal opportunity to be heard. Although the Orlando permit scheme does provide for a review of a denial of a permit before the Orlando City Council, there is no provision in the ordinance which exempts those persons from paying the costs for additional police protection who are unable to pay. The granting of a license permit on the basis of the ability of persons wishing to use public streets and parks to demonstrate, to pay an

---

**8.** During the three year period prior to the event in question, of the 152 permit fees charged, only 19 were for public issue assemblages. The balance were for commercial activities, social or sports activities or fund-raising activities. The cost of the public issue permits was approximately $12,000 out of a total of approximately $120,000. This demonstrates one of two possible conclusions: (1) that the cost of protecting the right of free speech on public issues is miniscule in the City of Orlando; or (2) that the permit fees discourage public demonstrations in Orlando.

unfixed fee for police protection, without providing for an alternative means of exercising First Amendment rights, is unconstitutional. *Cf. Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702. "Freedom of speech, freedom of press, freedom of religion are available to all, not merely to those who can pay their own way." *Murdock v. Pennsylvania,* 319 U.S. 105 at 111, 63 S.Ct. 870, at 874, 87 L.Ed. 1292.

In *Lubin v. Panish,* the Supreme Court invalidated a California statute which required candidates to pay a filing fee in order to have their names placed on the election ballot, without providing any alternative means of access to those who were unable to pay. The absence of alternative means of gaining access to the ballot inevitably rendered the California election system exclusionary as to some aspirants. The payment of the filing fees was an absolute, not an alternative condition and the failure to meet the filing requirement disqualified a person from running for office. The California scheme therefore operated to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters. The Court held that in the absence of reasonable alternative means of ballot access, a state may not consistent with constitutional standards require from an indigent candidate filing fees he cannot pay. 415 U.S. at 712, 94 S.Ct. at 1318.

Although *Lubin* concerned the right of access to the ballots of those candidates who were unable to pay the filing fees, we find that the same rationale should apply to the right of access to the streets for purposes of exercising First Amendment rights of freedom of speech. Although the record before us does not show that the appellants were unable to pay the costs of police protection, we are not bound by these considerations on reviewing the granting of a motion for summary judgment. The ordinance is attacked on facial constitutional grounds and the inability of some persons wishing to parade or demonstrate, who are unable to pay in advance, the costs for police protection, renders this statute unconstitutional.

■ Moreover, to the extent that the fees charged to the Central Florida Nuclear Freeze Campaign were based upon the content of the demonstrator's views, the City of Orlando charged the organizers of the march and rally for the enjoyment of a right guaranteed by the Federal Constitution. The right of free speech, exercised in a public forum, on issues of public concern, cannot be abridged by a governmental regulation which requires the speakers to prepay the costs of police protection, based on the content of the speaker's views. *Murdock, supra.* A function of speech in our society, as the Supreme Court has stated, is to invite dispute. "It may indeed best serve its high purposes when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1979). The possibility of hostile counter demonstrators, as a reaction to the Central Florida Nuclear Freeze Demonstration and Rally, was considered by the deputy chief of police in assessing the amount of costs it would charge the appellants for the additional police protection in conducting their activities. Such an inquiry into the content of the speakers' views in determining how much police protection is needed and as a consequence, how much the speakers would have to pay to voice their views, constitutes an impermissible price tag on the exercise of free speech based on the content of the speech. A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution. *Murdock v. Pennsylvania,* 319 U.S. 105, 113, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943). It is clear that an ordinance which has the effect of conditioning the granting of a park permit based on the content of the speaker's view is unconstitutional. *See Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 328, 95 L.Ed. 280 (1951). It is also clear, that in the case at hand, the defendant chief of police considered the effects of hostile counter demonstrators in assessing the costs of police protection. In answers to the plaintiff's interrogatories, the defendant stated that in addition to consider-

ing traffic control and the size of the demonstration, considerations of police protection from hostile counter demonstrators were also given effect. The defendant stated: "Due to the conventional nature of the rally and the close location of the Martin Marietta plant in Orlando, the potential for hostile counter activity was considered." The deputy chief of police, Frederick Walsh, testified in his deposition that the Nuclear Freeze Campaign permit costs included subjective considerations of police protection from hostile counter activity and the presence of out-of-town demonstrators.

The district court concluded that it was reasonable for the defendant to consider the ideas and policies being espoused by the license applicant and "that this information was relied on in an objective, nondiscriminatory fashion which comported with both common sense and the Constitution."

■ Although the presence of out-of-town demonstrators and the potential for hostile counter activity are proper factors to be considered in determining what level of police protection is needed for a public demonstration, we conclude that such factors cannot be considered in fixing the costs of protection to those asking to exercise their First Amendment rights. Otherwise, the result would operate to charge more for speech which is unpopular or controversial, in the mind of a public official. This does not comport with the First Amendment principle of equality of expression under the Constitution. The principle of equality of expression, inherent in the First Amendment, means that in the context of a public forum, the government must afford all points of view an equal opportunity to be heard. It forbids content discrimination and denies the government the power to determine which messages shall be heard and which suppressed. *See* Karst, *Equality as a Central Principle in the First Amendment*, 43 Chi.L.Rev. 20, 28 (1975–76). "Even a content neutral time, place and manner restriction may have unequal effects on various types of messages [and] [t]he resulting inequality may be constitutionally unacceptable, whether or not the discrimination is intended."

The effect of the Orlando ordinance, as applied in the case at hand, is to charge more for First Amendment activity which may require more police protection than less controversial speech; such a result places an undue burden on speech which is constitutionally unacceptable.

Lastly, we turn to the district court's holding that the Orlando ordinance did not import unbridled discretion to the chief of police in deciding whether or not to grant a permit.

The appellants also attack the Orlando ordinance on the grounds that it lacked narrow objective and definite standards in determining whether to pass on the additional costs of police protection to appellants and further that the ordinance was not the least restrictive means of accomplishing the governmental purposes served by the imposition of fees.

■ In determining whether additional police protection is needed for purposes of traffic and crowd control, the Orlando ordinance directs the chief of police to consider such factors as the "size, location and nature of the assembly." The ordinance offers no other standards by which to judge the nature of the assembly and it is clear that the deputy chief of police considered the content of the demonstration and rally in determining the need for additional police protection. Contrary to the district court's holding, the ordinance does not import objective and definite standards to guide the licensing official in considering "whether additional police protection reasonably will be required for the assembly for purposes of traffic and crowd control." A law subjecting the right of free expression in publicly owned places to the prior restraint of a license, without narrow, objective and definite standards is unconstitutional. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). There is here in the ordinance a potential for bias by the chief of police in determining how much police protection is needed in considering the nature of the assembly of the permit applicants. There are no standards in guiding

the licensing officials in deciding whether the costs of additional police protection should be passed on to those who wish to exercise their First Amendment rights of free speech in a public forum, between those who wish to hold a picnic in a city park on a Sunday afternoon. The phrase "nature of the assembly" simply leaves too much discretion in the chief of police to determine whether additional costs for police protection are needed.

■ An issue has also been raised whether the city has chosen the least restrictive means of achieving its governmental objective of controlling traffic on public streets and protecting the public safety. The city contends that the regulations are designed to protect "those public interests by requiring persons who parade or march to pay for police protection necessary to protect public safety along the route and are clearly a legitimate exercise of governmental authority."

However, the appellants argue that the chief concerns are not simply public safety but rather, the protection of the public treasury from the costs associated with policing the events. Moreover, the charging of overtime payment for police salaries is not the least restrictive means of achieving the governmental concerns of protecting the public safety. The use of state-certified reserve officers or the use of regular officers at non-overtime pay, would have served to diminish the restraints upon the exercise of First Amendment rights. We disagree with the district court's holding that the defendants' decision to use active off-duty police, even at an overtime pay rate was not an unreasonable choice under the facts at hand. The city has other reasonable alternatives which it could have utilized to keep the costs for additional police protection that it charged the appellants as low as possible. The use of reserve police officers, who are not entitled to contractual overtime pay, rather than

active duty police officers, was a reasonable alternative for the city to employ.[9]

## V. THE CONCURRING OPINION

■ The concurring opinion agrees that the ordinance is unconstitutional, but only because of its failure to provide for prompt judicial review. Since this particular challenge to the ordinance was neither mentioned in the complaint nor in appellants' brief, we did not discuss it in the original majority opinion. However, since the trial court's failure to find the ordinance unconstitutional on this ground was "plain error," we agree with the concurring opinion to the extent that it considers the ordinance unconstitutional on the ground stated.

## VI. CONCLUSION

We conclude that the ordinance is unconstitutional on its face and as applied.

The judgment is **REVERSED** and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

ALBERT J. HENDERSON, Circuit Judge, concurring:

I agree that the ordinance here is unconstitutional on its face but only to the extent that it fails to provide for prompt judicial review of the denial of a permit, an issue left unaddressed by the majority opinion. Strict procedural safeguards are required for prior restraints on speech. *See National Socialist Party of America v. Village of Skokie,* 432 U.S. 43, 44, 97 S.Ct. 2205, 2206, 53 L.Ed.2d 96, 98 (1977) (per curiam). A licensing regulation which grants city officials the discretion to deny permits must provide for speedy review to ensure constitutional protection. *See Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 675–76 (11th Cir.1984), *modified* 742 F.2d 590 (1984).

**9.** The Orlando police department employs reserve police officers who earn between $6.21 per hour and $8.05 per hour. These officers who are generally doctors, lawyers and businessmen volunteer their services for 20 hours a month as auxiliary officers and have all the qualifications and powers of arrest as regular officers. Reserve officers have no contractual claim to overtime payment.

The Orlando ordinance directs the chief of police to determine the amount of police protection "reasonably" required for traffic and crowd control, Orlando City Ordinance § 18A.12, and to deny applications for permits if the policing expenses are not prepaid. *Id.* § 18A.13(8). This authority is precisely the sort of discretion to restrain free expression which triggers the requirement of prompt judicial review. In *Miami Herald,* for example, this court invalidated a city ordinance which conditioned the issuance of licenses to operate newsracks on compliance with "all applicable provisions of the city Code," *Miami Herald,* 734 F.2d at 669. Because it vested in city officials discretion to determine which ordinances and regulations were "applicable" to newspaper vending machines without also providing for ready judicial review, it failed to supply an adequate constitutional guarantee against an abuse of that discretion. *Id.* at 673–76. The authority to deny parade licenses on the basis of the failure to prepay "reasonably" required expenses confers at least as much discretion as an ordinance permitting the denial of a permit because of noncompliance with "applicable" regulations.

Although the Orlando ordinance states that "[a]ny applicant aggrieved shall have the right to appeal the denial of a permit to the city council of the city," Orlando City Ordinance § 18A.15, it lacks the adversarial feature of judicial review. "[O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression...." *Freedman,* 380 U.S. at 58, 85 S.Ct. at 739, 13 L.Ed.2d at 654.

In light of this conclusion, I would not reach the remaining issues. However, because the majority did not feel so constrained, I write separately to express my disagreement with its views on several other important constitutional questions.

The majority misreads *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), as permitting only nominal charges for policing a demonstration in a public area. The fee approved in *Cox* was not nominal, but instead ranged "from $300 to a nominal amount." *Id.,* 312 U.S.

at 576, 61 S.Ct. at 766, 85 L.Ed. at 1054. The Court found "nothing contrary to the Constitution in the charge of a fee limited to the purpose" of meeting the "expense[s] incident to the administration of the [licensing statute] and to the maintenance of public order...." *Id.,* 312 U.S. at 577, 61 S.Ct. at 766, 85 L.Ed. at 1054.

*Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), did not overrule *Cox*'s endorsement of charges greater than a token amount. *Murdock* invalidated a flat license fee levied on distributors of religious literature. Distinguishing *Cox,* the Court stated that it was not confronted with

> state regulation of the streets to protect and insure the safety, comfort, or convenience of the public. Furthermore, the present ordinance is not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitation. As we have said, it is not merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community. And the *fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home* against the abuses of solicitors.

*Murdock,* 319 U.S. at 116, 63 S.Ct. at 876, 87 L.Ed. at 1300 (citations omitted). The majority's reliance on the *Murdock* Court's use of the word "nominal" misapprehends the basis of the decision—that the flat license tax was not justified by any legitimate state interest. If anything, *Murdock* reaffirms the principle that concerns for public safety support restrictions on speech.

It is true that the ordinance here permits the assessment of unreasonable fees, an issue not addressed by the *Cox* Court. The charges there were subject to a limitation. However, the reasoning in *Cox* establishes that fees are constitutionally permissible as long as they are attributable to the cost of ensuring public safety. A different view

would be unprecedented, and contrary to the interpretation of *Cox* by at least three other circuits. *See Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1056 (2d Cir.1983) (license fee invalidated because the plaintiffs failed to show that the charge was equal to the administrative costs incurred); *Fernandes v. Limmer,* 663 F.2d 619, 633 (5th Cir. Unit A 1981) ("A licensing fee to be used in defraying administrative costs is permissible, *Cox v. New Hampshire, supra,* but only to the extent that the fees are necessary...."); *Baldwin v. Redwood City,* 540 F.2d 1360, 1372 (9th Cir.1976) ("In some circumstances a city may both require a permit for activity involving free expression without violating the First Amendment and also collect fees that fairly reflect costs incurred by the city in connection with such activity."), *cert. denied,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

The majority also faults the ordinance as being content-based. Restrictions founded on the content of speech are disfavored because of the danger that free expression may be discouraged or prohibited " 'merely because public officials disapprove the speaker's view.' " *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319, 327 (1980) (quoting *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 325, 333, 95 L.Ed. 267, 276 (1951) (Frankfurter, J., concurring)); *see also Clark v. Community for Creative Non-Violence,* — U.S. —, —, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221, 228 (1984). That risk is not present here. Consideration of the nature of the demonstration is strictly limited to evaluating its threat to public safety. The police costs depend not on whether state officials disapprove of the applicant's message but whether the public reacts disfavorably to the speaker's view. The ordinance does not discriminate on the basis of the group's viewpoint or the subject matter of the demonstration. Speech sufficiently controversial to endanger public safety when presented to one audience at a cer-

tain time and place may be completely uncontroversial to another audience at a different time and place. I fail to see how a restriction can be content-based when it treats identical speech differently in varying situations.[1]

Even if the ordinance is content-based it is not, as the majority indicates, automatically unconstitutional. The Supreme Court has repeatedly made clear that restrictions predicated on the content of the speech are simply analyzed under a stricter standard. "For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 804 (1984); *see also United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736, 744 (1983); *Widmar v. Vincent,* 454 U.S. 263, 269–70, 102 S.Ct. 269, 274, 70 L.Ed.2d 440, 448–49 (1981). In my opinion the ordinance here, by virtue of its concern for public safety, meets this standard.

Because the ordinance is unconstitutional on its face, I see no need to inquire further into the constitutional validity of its application in this instance. However, the majority assumes this additional burden by holding that less restrictive means were available to achieve the governmental purpose of protecting public safety. Deputy chief of police Frederick Walsh testified in his deposition that regular police officers must be paid for overtime under the union contract. *See* Record, vol. 1 at 169. He also stated that reserve officers are paid the same as regular officers for such duty in many cases since diverting them to police demonstrations often requires assigning regular officers at overtime pay to replace them. *Id.* at 182–83. From my review of the record the plaintiffs in this case were not charged different rates than other organizations which use public places for demonstrations or parades.

---

**1.** Interestingly, one commentor points to the precise problem here as support for abandoning the distinction between content-based and content-neutral restrictions on speech. Redish, *The Content Distinction in First Amendment Analysis,* 34 Stan.L.Rev. 113, 133 (1981).

By holding that local governments must pay virtually all the expense of police protection for a demonstration in a public area, the majority would place the burden of reasonable costs for police services in such a situation on the city alone, a result not mandated by *Cox.* It is not difficult to foresee the dangerous consequences of inadequate police supervision resulting from a municipality's inability or reluctance to allocate sufficient funds during, for example, a politically or racially charged parade. Although it would be a laudable gesture for local governments to subsidize the free expression of speech, it is not required by the Constitution. The "First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298, 306 (1981).