The **NATIONALIST MOVEMENT, a Mississippi non-profit corporation incorporated in Georgia, Plaintiff–Appellant,**

v.

The **CITY OF CUMMING, FORSYTH COUNTY, GEORGIA, Forsyth County Board of Education, Defendants–Appellees.**

No. 89–8417.

United States Court of Appeals, Eleventh Circuit.

July 5, 1991.

Richard Barrett, Learned, Miss., for plaintiff-appellant.

Gordon S. Smith, S. Samuel Griffin, King & Spalding, Atlanta, Ga., for City of Cumming.

Robert S. Stubbs, III, McVay & Stubbs, Canton, Ga., for Forsyth County, Ga.

Sam S. Harben, Jr., Harben & Hartley Law Firm, Gainesville, Ga., for Forsyth County Bd. of Educ.

(Footnote omitted.)

Before TJOFLAT, Chief Judge, and FAY, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges, and GODBOLD *, Senior Circuit Judge.

PER CURIAM:

A panel of this court held facially unconstitutional the provision of the Forsyth County ordinance requiring advance payment of a fee of up to $1,000 per day for a permit required of a private organization or group of private persons to conduct a parade or public meeting on the roads or other public property of the County. *The Nationalist Movement v. The City of Cumming, Forsyth County, Georgia, Forsyth County Board of Education,* 913 F.2d 885 (1990). The panel decision relied upon the holding of *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1521 (11th Cir.1985), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986), that only nominal charges are constitutionally authorized for the use of city streets and parks to further First Amendment activities and held that a fee of up to $1,000 per day exceeded the constitutional requirement that such a charge be at most nominal. A majority of the active judges in regular active service ordered that the appeal be reheard by the court en banc in order that the court might consider whether the holding of *Central Florida* relied upon by the panel should be overruled. 921 F.2d 1125 (1990). That order vacated the panel opinion.

The court en banc, having considered the issue above described and having discussed and considered the panel opinion and the briefs of the parties, now reinstates the panel opinion in its entirety.

IT IS SO ORDERED.

TJOFLAT, Chief Judge, concurring in part and dissenting in part in which BIRCH, Circuit Judge, joins:

I respectfully dissent from the court's holding that the Forsyth County (the County) ordinance, pursuant to which the County Administrator (the Administrator) sought to charge the Nationalist Movement (the Movement), a corporation, a $100 fee to assemble on the County courthouse steps, is facially invalid.[1] I believe that a facial challenge to the ordinance was inappropriate and that we should remand the case to the district court to determine whether the fee assessed here withstands constitutional scrutiny.[2]

In count two of its complaint, the Movement alleged that the County ordinance was facially invalid because it did not prescribe carefully tailored standards for the Administrator when he (1) reviews applications for permits and (2) sets permit fees. In count three—an as-applied challenge—the Movement contended that the Administrator's imposition of the $100 fee on the Movement and his failure to waive that fee rendered the application of the ordinance to the Movement constitutionally infirm. Finally, in count four, the Movement alleged that the Administrator acted to suppress the Movement's speech because he disagreed with its content.[3] Based on these allegations, the Movement sought a temporary restraining order and preliminary and permanent injunctions "enjoining [the County], [its] officers, agents, servants, employees, attorneys and those persons in

* Senior U.S. Circuit Judge John C. Godbold has elected to participate in further proceedings in this matter pursuant to 28 U.S.C.A. § 46(c).

1. I concur in the court's disposition of the Movement's claims against the County School Board and the City of Cumming.

2. Although the Movement sought to enjoin the County from interfering with the rally it scheduled for January 21, 1989, the passage of that date has not mooted the case. The Movement (or the Forsyth County Defense League—an independent affiliate of the Movement) had parad-

ed in Forsyth County in 1986, 1987, and 1988, and presumably intends to parade in future years. Thus, the County's conduct is capable of repetition yet would evade review, *see Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), and so this court will hear the Movement's claim.

3. Count one involved charges against the City of Cumming.

active concert or participation with [it] [4] from interfering in any way with [the Movement's] assembly ... at the Forsyth County Courthouse between 8:00 AM and 11:00 AM, January 21, 1989." [5] Specifically, it sought to enjoin the enforcement of a County Ordinance "prohibiting [it] from holding [a] rally without pre-paying a $100.00 fee." The Movement also sought declaratory relief against the County that would prohibit the County from using sections 3(6) and 3(7) [6] of the County ordinance "to impose unreasonable or excessive fees, or fees at all upon impecunious nonprofit corporations." The Movement asked that the court declare these sections violative, on their face or as applied, of the Movement's constitutional rights of freedom of speech, association, and assembly.[7]

The district court rejected the Movement's facial challenge, concluding that the Administrator's discretion was properly circumscribed. It then held that the Administrator did not impose an unconstitutional fee in this case; specifically, the court found that the Administrator did not discriminate against the Movement based on the content of its speech. The panel opinion, which a majority of this en banc court reinstates, held, however, that the County ordinance's fee provision was facially invalid because it could result in the imposition of more than a "nominal" fee, contrary to *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515, 1521 (11th Cir.1985) (interpreting *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) and *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986).

In this opinion, I first, in parts I.A and I.B, examine the overbreadth doctrine and its application to statutory licensing schemes. Then, in part I.C, I consider whether the County ordinance unconstitutionally delegated to the Administrator the authority to set a fee of up to $1000, given that *Cox* sanctions only nominal fees on expressive activities. After discussing the relevant Supreme Court precedent, I conclude that the County ordinance adequately curtails the Administrator's discretion and hence survives facial scrutiny. Finally, in part II, I demonstrate that we should remand this case to the district court to determine whether the $100 fee the Administrator charged the Movement is nominal in light of the Movement's financial resources and the administrative and public order expenses that necessarily would have been occasioned by its proposed assembly.

---

**4.** The Movement asked the court to enjoin these County personnel from enforcing the ordinance. The Movement did not, however, make any of those persons parties defendant in the lawsuit; it only named the County. Thus, any injunctive relief the Movement obtains must be directed solely against the County.

**5.** Despite this broad language, the Movement does not assert that no time, place, or manner restriction constitutionally can be placed on paraders; rather, it contends that any fee—or any fee greater than a nominal fee—is unconstitutional.

**6.** Sections 3(6) and (7) of the ordinance provide:
(6) Every private organization or group of private persons required to procure a permit under the provisions of this Ordinance shall pay in advance for such permit, for the use of the County, a sum not more than $1,000.00 for each day such parade, procession, or open air meeting shall take place. The Administrator shall adjust the amount to be paid in order to meet the expense incident to the adminis-

tration of the Ordinance and to the maintenance of public order in the matter licensed. In no event shall the Administrator calculate the amount of the permit fee by considering said fee as a revenue tax.
(7) If the private organization be other than individuals, a permit will not issue without the paying of the necessary fee; individuals may be excused from such a deposit on account of indigence upon the execution under oath, by each individual in the group applying for the permit, of a pauper's affidavit. Prior to the receipt of such an affidavit the Administrator shall advise the applicant orally or in writing of the penalties for the execution of a false document.

**7.** The parties and the court generally have treated the corporation as the first amendment proponent that wishes to exercise *its* first amendment rights, *see First Nat'l Bank v. Bellotti,* 435 U.S. 765, 784, 98 S.Ct. 1407, 1420, 55 L.Ed.2d 707 (1978), i.e., the corporation, rather than individuals, genuinely is doing the speaking. For purposes of this opinion, I treat it similarly.

## I.

### A.

A litigant who makes a facial challenge to a statute ordinarily "must establish that no set of circumstances exist under which [the statute] would be valid. The fact that [the statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid...." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). In first amendment cases, however, the Supreme Court has recognized that where a statute covers both protected and unprotected expressive or associational activities, a litigant who himself is engaged in unprotected activity may challenge the statute based on "[its] *potential* reach ..., *conceivable* sets of circumstances, and *possible* direct and indirect burdens on speech." *American Booksellers v. Webb*, 919 F.2d 1493, 1499–500 (11th Cir.1990). This doctrine, known as the overbreadth doctrine, thus protects the public from the chilling effect that such a statute has on protected speech; the court will strike down the statute even though in the case before the court the governmental entity only enforced the statute against those engaged in unprotected activities. "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society," *Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973); thus, when a statute "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected expressive rights, a court may hold the law void on its face. *See Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940).

Although the doctrine and its protective purposes are stated broadly, we must, in applying it, keep in mind two cardinal rules governing the exercise of federal court jurisdiction. First, the federal courts should not anticipate a question of constitutional law in advance of the necessity of deciding it. Second, the federal courts should not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985); *see also United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960); *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885); *cf. Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917. Since the overbreadth doctrine represents a deviation from these general principles, we should employ it "sparingly and only as a last resort." *Id.* at 613, 93 S.Ct. at 2916.

Thus, the Court has held that the overbreadth of a statute "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep," before a federal court may facially invalidate it. *Id.* at 615, 93 S.Ct. at 2918 (substantial overbreadth must be shown "particularly where conduct and not merely speech is involved"); *see also Brockett*, 472 U.S. at 503–04, 105 S.Ct. at 2801–02 (*Broadrick's* substantial overbreadth requirement also is applicable when pure speech rather than expressive conduct is at issue). In addition, a statute is not overbroad when the court can use a narrowing construction that limits the statute's reach to unprotected activity. In sum,

> an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. If the overbreadth is "substantial," the law may not be enforced against anyone, including the party before the court, until it is

narrowed to reach only unprotected activity, whether by legislative action or by judicial construction or partial invalidation.

*Brockett,* 472 U.S. at 504, 105 S.Ct. at 2802 (footnote omitted).[8] I now examine the application of the overbreadth doctrine to a statutory licensing scheme.

### B.

In the quintessential overbreadth challenge, a criminal defendant seeks to overturn his conviction under a statute that encompasses both protected and unprotected expression. The defendant may have engaged in unprotected speech, but the court will permit him to challenge the facial validity of the statute under which he was charged on the ground that the statute is so broad that it chills others from protected speech. In *Lewis v. City of New Orleans,* 415 U.S. 130, 132, 94 S.Ct. 970, 972, 39 L.Ed.2d 214 (1974), for example, the appellant was arrested and convicted for violating a New Orleans ordinance that prohibited persons from "wantonly . . . revil[ing] or . . . us[ing] obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." The Court held that it was immaterial whether the words the appellant used might be punishable under an ordinance that limited the prohibition to fighting words (clearly proscribable conduct). The ordinance could withstand attack only if it was "not susceptible of application to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments." *Id.* at 134, 94 S.Ct. at 973. In other words, in

overturning the appellant's conviction, the Court examined the "conceivable applications" of the New Orleans ordinance, finding that a broad swath of the proscribed conduct was constitutionally protected.

An overbreadth challenge also may lie when a statute, rather than imposing criminal penalties directly, authorizes a government official to administer a licensing scheme and then criminalizes expressive activity undertaken without first obtaining a license. In an attack on such a scheme, a court asks whether the law delegates "unfettered discretion" to the licensor; if so, the potential for content- or viewpoint-based discrimination becomes so great that the court will invalidate the statute on its face. *See, e.g., Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969); *Staub v. Baxley,* 355 U.S. 313, 322–25, 78 S.Ct. 277, 282–84, 2 L.Ed.2d 302 (1958); *Kunz v. People of New York,* 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951); *cf. Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951) (invalidating a licensing *practice* on overbreadth grounds). The court should not assume, however, that the licensor will disregard statutory directives that purport to circumscribe his discretion; only if the standards are themselves constitutionally inadequate will the court facially invalidate the statute.[9] Thus, a licensing statute with "narrowly drawn, reasonable and definite standards for the officials to follow," *id.* at 271, 71 S.Ct. at 327, will survive facial scrutiny.

A statute or ordinance, on the other hand, that grants the licensor unbridled discretion—allowing him surreptitiously to

---

8. *Accord Webb,* 919 F.2d at 1499–500 (considering the potential range of materials covered by a "harmful to minors" statute and the possible burdens the statute placed on adult access):

> The [Supreme] Court has recognized that when overly broad statutory language seems to sweep protected First Amendment expression directly into the scope of a regulation affecting speech, or indirectly places an undue burden on such protected activity, free expression can be chilled even in the absence of the statute's specific application to protected speech. For this reason, the Court has recognized the so-called overbreadth doctrine in the limited context of First Amendment

facial challenges. Since the overbreadth doctrine in effect requires courts to evaluate the *potential* reach of a statute, *conceivable* sets of circumstances, and *possible* direct and indirect burdens on speech, "[t]he Supreme Court has noted that the overbreadth doctrine is 'strong medicine' that should be employed only 'with hesitation, and then "only as a last resort." ' "

9. It is, of course, possible that the licensor will disregard the statutory standards, but the defendant can challenge that lapse in either an as-applied or state-law challenge.

discriminate against speech that he does not like—must fall when challenged. Facial invalidation is proper because the license applicant would find it difficult to show that, in a particular case, the licensor restricted the applicant's speech based on its content. While I acknowledge the strength of these concerns, I believe that the government properly may give public officials charged with administering licensing schemes a considerable degree of discretion before constitutional concerns are implicated.[10]

### C.

#### 1.

In the instant case, the Movement makes two contentions. It first contends that the County ordinance did not prescribe sufficiently tailored standards for the Administrator to use in reviewing permit applications. An examination of the ordinance reveals, however, that this contention is baseless:

> Unless some significant interference with the rights of non-participating citizens exists, or the orderly flow of traffic would be obstructed unreasonably, or the public safety be endangered, or there be other unreasonable interference with the public welfare, peace, safety, health, good order, and convenience of the general public, the permit shall be granted.

> Where more than one permit is sought for the same date, the administrator shall have authority to designate reasonable sites and set time schedules for the beginning and ending of the activity. The administrator shall have authority to cancel the permit where the activity fails to begin within a reasonable time after the time set for it to begin, based on other activities for which permits have been granted or based on the unreasonable interference caused by such delay with the public welfare, peace, safety, health, good order and convenience to the general public.

Amended County Ordinance § 7(c). These requirements adequately circumscribe the Administrator's discretion; he must issue a permit unless he can point to a specific instance in which the ordinance permits him to deny a permit or reasonably modify the applicant's requested schedule or situs. *Cf. Hague v. CIO*, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (affirming facial invalidation of ordinance that did *not* "make comfort or convenience in the use of streets or parks the standard of official action" but enabled the licensor "to refuse a permit on his mere opinion that such refusal [would] prevent 'riots, disturbances or disorderly assemblage' ").

The Movement argues alternatively that the County ordinance does not provide narrowly-drawn, reasonable standards for the Administrator to use in setting fees. Although the ordinance allows the Administrator considerable scope in assessing a fee, it limits his discretion in two important respects: it limits the permissible range of fees that the Administrator can charge, from zero to $1000, and the permissible components of the fee, sums necessary to meet the expenses incident to (1) the administration of the ordinance and (2) the maintenance of public order. These limitations mirror the statutory limitations that the Supreme Court upheld in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

In *Cox*, a New Hampshire statute that imposed a "reasonable" license fee for each day of a parade, procession, or open-air public meeting, and criminal penalties for activity undertaken without such a license, survived constitutional scrutiny. The facts were as follows. A group of Jehovah's Witnesses paraded in the business district of the City of Manchester without a license; they were arrested and later convicted for violating the statute. They then challenged the facial validity of the statute on first amendment grounds.

The Supreme Court, on direct review, upheld the convictions even though the

---

**10.** This parallels the notion that a statute must be substantially overbroad before it is subject to facial invalidation; in both licensing and nonlicensing cases, the statute must sweep a significant range of protected activity within its reach or it will survive facial challenge.

statute permitted the licensor to charge a fee of "not more than three hundred dollars for each day such licensee shall perform or exhibit, or such parade, procession or open-air meeting shall take place." *Id.* at 571 n. 1, 61 S.Ct. at 764 n. 1. The Court emphasized that a prior state supreme court opinion had construed the statute to require "a reasonable fixing of the amount of the fee." *Id.*[11] In addition, the state court had held that the fee was "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id.* at 577, 61 S.Ct. at 766. The Supreme Court determined that a fee "limited to the purpose stated" was constitutional, *id.*, at least so long as it has been administered in a fair and nondiscriminatory manner, as required by the state court construction, *id.*

The Court then contrasted the discretion granted to the *Cox* licensor with the discretion of the licensor in *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). In *Hague*, the licensor had minimal standards to guide him in reviewing applications. He could prohibit assembly on the streets, but he was not instructed to make "comfort or convenience in the use of streets the standard of official action"; rather, he was to refuse to issue a permit if, in his opinion, such refusal would prevent "riots, disturbances or disorderly assemblage." *Cox*, 312 U.S. at 577, 61 S.Ct. at 766. After considering that limitation, the Court held that the licensor's discretion was not sufficiently channeled and, hence, was unconstitutional. *Hague*, 307 U.S. at 516, 59 S.Ct. at 964. The statute in *Cox*, on the other hand, instructed the licensor to approve all applications if "the convenience of the public in the use of the streets would

not thereby be unduly disturbed"—he merely could assess a reasonable fee for doing so.

Even though the discretion accorded to the licensor in *Hague* was far more sweeping than that in *Cox*, the *Cox* licensor—as well as the Administrator here—could, contrary to statute and the Constitution, adjust the fee to discriminate on the basis of content or viewpoint. If, for example, the licensor opposed the parade application of an impecunious pro-life group, on the basis of its views, and supported the application of an impecunious pro-choice group, he could, under the ordinance, charge the full administrative and public order expenses (up to $1000) to the pro-life group, while charging the pro-choice group a $1 fee. He thus could set a fee that effectively would prohibit the pro-life group from parading.[12] While recognizing some potential for content-based discrimination, *Cox* held that the restrictions the statute placed on the licensor would curtail such abuses of discretion. First, the statute, in that case, placed a cap of $300 on the fee that the licensor could charge the applicant. Thus, even if the licensor misused his discretion, the barrier he erected would not be, in theory, absolute. The statute also limited the permissible components of the fee. Thus, if the licensor calculated the administrative and public order expenses associated with the pro-life group march at only $50, he could charge no more.

Given these inherent limits on the licensor's authority, the Court next considered the benefits that would be realized by permitting the licensor some leeway in assessing fees. The Court noted that the statute's scope of discretion, although carrying with it the possibility for content-

---

11. The state supreme court also noted that under the New Hampshire statute "the charge for a circus parade or a celebration procession of length, each drawing crowds of observers, would take into account the greater public expense of policing the spectacle, compared with the slight expense of a less expansive and attractive parade or procession, to which the charge would be adjusted." *Cox*, 312 U.S. at 576–77, 61 S.Ct. at 766.

12. The ordinance could be read to prohibit this type of discrimination—under one interpretation, the ordinance compels the Administrator to impose the *full* administrative and public order expenses on the applicant. (The ordinance states the "[t]he Administrator shall adjust the amount to be paid in order to meet the expense incident to the administration of the Ordinance and to the maintenance of public order in the matter licensed.") This was not, however, the interpretation adopted by the Administrator here.

based discrimination, permitted a licensor to adjust fees in accordance with the actual administrative and public order costs an applicant imposed on the state rather than simply imposing a flat fee that approximates those costs (the average cost imposed by all applicants). Consequently, if an applicant requested permission to assemble with five other persons in a county park, then he would pay less than fifteen hundred people who wanted to parade down a major thoroughfare; likewise, the applicant with meager resources would pay less than the applicant with plentiful resources. The Court "perceive[d] no constitutional ground for denying to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Id.* I, too, believe that the ability to draw these distinctions is desirable.

Since the limits the County ordinance places on the Administrator's discretion to set a permit fee accord with the limits on the licensor's discretion in *Cox*,[13] that case should control unless later Supreme Court precedent or congressional directives instruct otherwise.

### 2.

The panel opinion, and now the majority of the en banc court, holds that the County ordinance is facially invalid because it permits the Administrator to assess more than a nominal fee. According to the court, the Constitution limits not only the permissible components of a fee—the cost of administering the ordinance and the maintenance of public order—but also its size. *Nationalist Movement v. City of Cumming*, 913 F.2d 885, 891 (11th Cir.1990). The court does not adequately explain, however, why the fee must be nominal, or even what that term means in this context; it merely tells us that the Supreme Court, in *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870,

87 L.Ed. 1292 (1943), read *Cox* to sanction only a nominal fee. The panel opinion, and the en banc court, thus adopt the interpretation of *Cox* and *Murdock* employed by a panel of this court in *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1521 (11th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986).

In *Walsh*, a panel of this court invalidated an ordinance that forced persons using city streets and parks for expressive activities to pay the full cost of additional police protection necessitated by those activities. In that case, an organization calling for a nuclear freeze (the Campaign) wanted to conduct a parade and rally in the City of Orlando (the City); approximately one thousand people were expected to attend. Before the City would issue a permit, the Campaign had to pay the City $1435.74 for the additional officers needed to police the march. The chief of police, who had authority under the ordinance to "determine whether and to what extent additional police protection reasonably w[ould] be required for the assembly for purposes of traffic and crowd control," *id.* at 1516 n. 2, considered several factors—including his belief that due to the controversial nature of the rally, the close proximity of Martin Marietta, and the probable attendance of out-of-town demonstrators, "the potential for hostile counter activity existed"[14]—and determined that more than the usual number of officers were needed to police the event.

In assessing the constitutionality of Orlando's ordinance, the panel had this to say about *Cox*:

The [*Cox*] Court therefore viewed the fee requirement as charges to meet expenses incidental to the administration of the regulation and the costs of policing the event. Although the Court did uphold the fee requirement, it is important to note that the Court did not touch on

---

**13.** Even though the County ordinance permits the Administrator to assess up to a $1000 fee—not simply a $300 fee—a $1000 fee imposed in 1990 would be less, when adjusted by the consumer price index, than a $300 fee imposed in the *Cox* case in 1941.

**14.** The ordinance required the Chief to consider such factors as the size, location, and nature of the assembly.

the reasonableness of the fees or how they could be fixed. Thus, important questions still remain about the application of *Cox* under modern constitutional doctrine. Importantly, the *Cox* Court did not address circumstances where persons who wish to demonstrate are unable to pay the required fee, nor did the Court concern itself with a statute which is unlimited in the amount of fees that can be charged as expenses, nor with the question whether the charge can be based, at least partially[,] on the content of the speech.

*Id.* at 1522. The court went on to consider the degree to which *Murdock, see infra* pp. 1490–91, clarified when a governmental entity can charge fees as a prerequisite to the exercise of first amendment rights in a traditional public forum. It concluded that *Murdock* only authorizes such an entity to charge a fee that is both nominal and related to the expenses incidental to the administration and policing of the event. *Id.; see also id.* at 1523 ("Although license fees are proper for the costs of administering an event, under the Supreme Court's decision in *Cox v. New Hampshire*, we read *Cox* as authorizing only nominal charges for the use of city streets and parks to further First Amendment activities."). *Contrast Kaplan v. County of Los Angeles*, 894 F.2d 1076, 1081 (9th Cir.1990) (more than a nominal fee for use of a nontraditional public forum is permissible). Although the panel did not clearly state why only nominal fees survive constitutional scrutiny, the court noted that to the extent that the fees charged to the Campaign were tied to its views—i.e., more police protection was required for demonstrators with more controversial views—the fees were unconstitutional, *id.* at 1524–25; while the presence of out-of-town demonstrators and the potential for hostile counteractivity were proper factors to be considered in determining what level of police protection was needed for a public demonstration, such factors could not be considered in fixing the fee to be charged to those seeking to exercise their first amendment rights. The court stated:

The effect of the Orlando ordinance, as applied in the case at hand, is to charge more for First Amendment activity which may require more police protection than less controversial speech; such a result places an undue burden on speech which is constitutionally unacceptable.

*Id.* at 1525.

I agree with this reading of *Cox* and *Murdock*, but I also believe that we should explain why only a "nominal" fee is constitutional—an idea that neither the panel opinion in the instant case nor *Central Florida* sufficiently developed. Once the reasoning that underlies the rule is revealed, it becomes apparent that the facial challenge to the statute in *Cox* would still fail today—the *Cox* Court properly determined that the licensor's discretion was limited in accordance with the Constitution. I first examine the relevant Supreme Court authorities, which tell us when the licensor's discretion exceeds the constitutional limits, and then analyze the Forsyth County ordinance in light of them.

In *Murdock*, a case decided only two years after *Cox*, the Supreme Court carefully circumscribed the *Cox* holding. *Murdock* involved a city ordinance that required all persons who solicited orders for any kind of merchandise to procure a license at a specified cost. *Murdock*, 319 U.S. at 106, 63 S.Ct. at 872 ("[f]or one day $1.50, for one week seven dollars ($7.00), for two weeks twelve dollars ($12.00), [and] for three weeks twenty dollars ($20.00)"). Jehovah's Witnesses, who had distributed literature and solicited door-to-door, were convicted and fined for engaging in such expressive activities without first purchasing licenses.

The Supreme Court struck down the ordinance as applied; the petitioners were engaged in selling activities merely incidental to their main object, which was to preach and publicize the doctrines of their order. The government, the Court held, could not impose a substantial financial burden on the petitioners simply for exercising their constitutional rights. *Id.* at 112–13, 63 S.Ct. at 874–75. The Supreme Court then contrasted the license fee in *Murdock* to a

nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. *Id.* at 113–14, 63 S.Ct. at 875. According to the Court, the situation before it clearly was unlike that in *Cox;* in *Cox* the state regulated the streets

> to protect and insure the safety, comfort, or convenience of the public. Furthermore, the present ordinance is not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitations. As we have said, it is not merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community. *And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors.*

*Id.* at 116, 63 S.Ct. at 876 (citation omitted; emphasis added). This language, I believe, restricts *Cox* to the proposition that any fee imposed on the exercise of first amendment rights in a traditional public forum, even if calculated to defray the administrative or public order expenses associated with the activity, must be nominal if it is to survive constitutional scrutiny.[15] It is important, however, to consider the reasons underlying the *Murdock* holding.

I believe that the *Murdock* Court characterized such license fees as "nominal" because it recognized that anything more than a nominal fee likely would be content—or viewpoint-based—on its face or in its impact—and thus contrary to the first amendment, *see, e.g., United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (government may enforce reasonable time, place, and manner regulations in public forums as long as the restrictions are content-neutral); *Linmark Assocs., Inc. v. Township of Willingboro,* 431 U.S. 85, 96, 97 S.Ct.

1614, 1620, 52 L.Ed.2d 155 (1977). *See generally* Stephan, *The First Amendment and Content Discrimination,* 68 Va.L. Rev. 203 (1982). For example, if the Administrator calculated the public order expense to include the cost of protecting the Movement from irate citizens of Forsyth County, the public order expense would vary directly with the controversy surrounding the Movement's views, i.e., it would be content-based. If these costs constitutionally could be shifted, opponents of the Movement effectively could prevent its speech by civil disobedience (the heckler's veto). Likewise, if the Administrator spends an inordinate amount of time on the Movement's application because he feels that its assembly carries with it the potential for conflict, the Administrator's actions are related to the content of the Movement's speech. The Administrator may, for example, talk for hours with the chief of police, conferring with him as to how they can avert a breach of the peace by counterdemonstrators. Or he may seek counsel from the County attorney, or advice from the County commissioners, as to whether he may deny the Movement's petition because he would prefer that the Movement not assemble in the County. In either instance, the administrative expenses are related to the content of the Movement's speech, and it would be unconstitutional to assess it any percentage of these costs. Because of this potential for content-based discrimination, the *Murdock* Court, as a prophylactic rule, requires licensors to impose only nominal fees—even in cases in which the content neutrality of the charges has not been questioned. Thus, a license fee must be both nominal *and* content-neutral.

While the *Murdock* Court did not elaborate on the precise meaning of "nominal," it seems that the fee must be small in relation to the total administrative and public order expenses *necessary* for the County to perform its obligations and small in

**15.** The implications of this language are even more restrictive. In *Murdock,* the Court indicated that a nominal fee could be exacted to cover the costs of protecting those who might be harmed by the exercise of constitutional rights.

At least in some instances in which members of an organization seek a parade permit, the police protection and maintenance of public order is necessitated by the potential disruptiveness of the crowd—not the participants in the parade.

relation to the applicant's financial resources. According to Webster's New World Dictionary (D. Guralnick 2d ed. 1972), "nominal" may mean either "in name only, not in fact {the *nominal* leader} [or] very small compared to usual expectations; slight {a *nominal* fee}." *Cf.* Black's Law Dictionary 946 (5th ed. 1979) ("[n]ot real or actual; merely named, stated, or given, without reference to actual conditions; often with the implication that the thing named is so small, slight, or the like, in comparison to what might properly be expected, as scarcely to be entitled to the name"). If, however, the Court had used nominal to denote "in name only": a "peppercorn" or a dollar, it presumably would not have articulated two permissible components of the fee. Given then the potential range of fees that constitutionally may be assessed, I do not believe that the County ordinance sweeps so broadly that we must facially invalidate it.[16] Instead, I believe that the Movement should prevail only if it can demonstrate that, in the instant case, the Administrator assessed it an unconstitutional fee.

## II.

While a nominal fee related solely to the cost of processing an application would be acceptable under Supreme Court precedent, *see Cox*, 312 U.S. at 577, 61 S.Ct. at 766; *Murdock*, 319 U.S. at 116, 63 S.Ct. at 876, a fee, whether relating to administrative or public order expenses, that has a substantial disparate impact on persons espousing controversial views is unconstitutional. The district court found, however, that the Administrator based his decision to charge a $100 fee

> solely on the efforts he expended researching the plaintiff's application, and not on the potential cost of attendant police protection which might be occasioned by the parade.... [T]he determination of the fee under those circumstances is based solely upon content-neutral criteria; namely, the actual costs incurred investigating and processing the application, regardless of the nature of the applicant's proposed assembly.

Thus, the district court held that the Forsyth ordinance did not implicate the constitutional concerns expressed in *Central Florida* that the fee might be content-based. (The court did not, however, examine whether the Forsyth ordinance provided for a nominal fee; rather, it looked at the lawful components of that fee, holding that, under the facts of this case, the fee was based solely on the costs of processing the application and that this was constitutionally permissible.) While I do not believe that administrative expenses necessarily are content-neutral, *see supra* p. 1491, on the facts of this case, I believe that the district court did not err in determining that there was no discrimination.[17] Even if, however, the fee imposed was content-neutral, the district court should have determined whether the fee was nominal, i.e., was it small relative to the *necessary*

---

**16.** In *Walsh*, this court does state that the City ordinance gave the chief of police unbridled discretion and, consequently, it should be facially invalidated on that ground as well. I believe that *Cox* forecloses this approach. (*Walsh* is, in any case, distinguishable. The Orlando ordinance permitted an *unlimited* charge for additional police protection based on factors such as the "size, location and nature of the assembly.")

**17.** The Movement presented no evidence that the fee was assessed on the basis of content, nor does the fee seem to be so excessive, particularly considering the facts surrounding the application process, that we necessarily are led to that conclusion. The Movement first submitted its application to the County in April 1987, over nine months before the rally. The County, relying on the terms of its amended ordinance,

determined that the Movement improperly submitted the application more than 60 days prior to the scheduled event. The Administrator reviewed the application with the county attorney and determined that it must be resubmitted within the applicable deadlines. The Movement then reapplied within the County timetable and the Administrator processed this request. Before the Administrator made a final decision on the application, however, the Movement decided to change its scheduled assembly time, from the morning to the afternoon of January 21st. After reviewing this amendment, the Administrator approved the application and sent a letter to the Movement stating that it would be permitted to assembly subject to payment of a $100 license fee. In essence, the Movement made three applications.

fees incurred by the County [18] and the applicant's resources. Thus, I would REMAND the case to the district court so that it may address this issue.[19]

FAY, Circuit Judge, dissenting, in which ANDERSON and EDMONDSON, Circuit Judges, join:

A majority of the en banc court has reaffirmed the law of our circuit as established in *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985) that only nominal charges are constitutionally authorized for the use of city streets and parks in connection with parades and rallies in furtherance of First Amendment activities. Although I am pleased that the en banc court considered this important question, it is my opinion that we continue to misread and misinterpret *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) and *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Most respectfully I dissent for the reasons stated in my special concurrence filed with the panel opinion.

18. Such an inquiry requires the district court to examine whether the time the Administrator spent on the Movement's application was reasonably necessary, e.g., was the time spent in consultation with County counsel appropriately considered as a cost of processing the Movement's application or was it attributable to general "start-up" costs, i.e., establishing general interpretive principles concerning the statute, that should be spread among current and future applicants? Necessary administrative expenses likely would vary depending on the location of the governmental entity; administrative expenses in New York City, for example, may be significantly higher than in Forsyth County, Georgia. In addition, I note that when the County purports to limit itself to charging a portion of the administrative fees, the fee it charges must be nominal in relation to those fees and not necessarily in relation to the total of administrative and public order expenses.

19. Since I believe that the calculation of a nominal fee encompasses a determination of a fee that is small in relation to the resources of the applicant, I do not believe that the fee waiver provision, even if uncertain, implicates its own constitutional concern. If, for example, a licensor assesses a $100 fee on an impecunious applicant and then refuses to waive that fee, the applicant challenges that levy on the ground that it is not nominal, not that the licensor would not waive the fee. On these facts, the applicant will prevail since a $100 fee is not nominal in relation to his resources.