United States Court of Appeals,

Eleventh Circuit.

No. 96-9336.

UNITED STATES of America, Plaintiff-Appellee,

v.

Abraham GILBERT, Defendant-Appellant.

Dec. 15, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-CR-257 JEC), Julie E. Carnes, Judge.

Before BIRCH, Circuit Judge, FAY, Senior Circuit Judge, and COHILL[*], Senior District Judge.

COHILL, Senior District Judge:

To Abraham Gilbert, life is one long legal battle these days, fought mostly around the ramparts of the Spring Street side of the Richard B. Russell Federal Building (hereinafter the "Russell Building") in Atlanta, Georgia. In 1979, the United States District Court for the Northern District of Georgia, which is located in the Russell Building along with several federal agencies, dismissed Gilbert's lawsuit against a former employer. Since then he has been protesting, even making the Russell Building his home for awhile, including sleeping, eating and bathing there. For a detailed description of this background, see *United States v. Gilbert,* 920 F.2d 878 (11th Cir.1991) ( "*Gilbert I* "). One might describe it as a veritable "Spring Ramparts Street Parade."

There is an overhang or portico on the side of the Russell Building where Gilbert liked to protest. At the behest of the Government, the district court issued an injunction prohibiting Gilbert *inter alia* "from public protesting, demonstrating, leafletting, displaying a sign, picketing, marching,

---

[*]Honorable Maurice B. Cohill, Jr., Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

speaking or chanting to the public, and engaging in similar expressive activity either inside the Russell Building or in the portico area under the overhang of the Russell Building." *Gilbert I,* 920 F.2d at 881.

The *Gilbert I* court generally affirmed the district court's issuance of the injunction but reversed and remanded in part, holding that the injunction went too far in prohibiting Gilbert "from sleeping in the unenclosed plaza ..." and could "not prohibit Gilbert from wearing expressive paraphernalia and speaking about anything he wishes inside the building and on the portico when he is lawfully in those areas." *Id.* at 887 n. 10.

On August 23, 1989, sometime before the *Gilbert I* court issued its January 10, 1991 opinion, an incident occurred at the Russell Building which resulted in the Government, through the Government Services Administration ("GSA"), placing a row of planters across the unenclosed plaza, and issuing a policy statement that, thereafter, for security reasons, only the area between Spring Street and the planters would be considered a public forum.[1] Demonstrations or protests would no longer be permitted in the area between the planters and the building. In addition, the policy required that all protestors obtain permits.

In 1995 this court heard "*Gilbert II*." In that case, *United States v. Gilbert,* 47 F.3d 1116 (11th Cir.1995), the court had to resolve the narrow question of whether there was sufficient evidence to support Gilbert's conviction for obstructing the entrance to the Russell Building in violation of the Federal Property Management Regulations, 41 C.F.R. § 101-20.305 (1996) ("the regulation") (creating a disturbance and/or obstructing entrance to government building). This court upheld the conviction because there was enough evidence "to support a reasonable fact finder's

---

[1] For a narrative of the incident which led to the installation of the planters, see *United States v. Philibert,* 947 F.2d 1467 (11th Cir.1991).

determination that Gilbert deterred patrons from utilizing the entrance he lay before" and that "Gilbert's conduct unreasonably obstructed the path to the courthouse entrance." *Gilbert II,* 47 F.3d at 1119.

The *Gilbert II* court could have decided the issue presently before this court, whether protests between the planters and the front steps were lawful or if the policy prohibiting protest in that area violated the First Amendment. Gilbert had been arrested on charges of failure to comply with the lawful direction of a Federal Protective Officer ("FPO") and for unreasonably obstructing the entrance to a federal building.. However, the facts presented at trial to support the charge of failing to comply with the lawful direction of an FPO did not match the facts alleged in the Information, and thus the government conceded there was insufficient evidence to support the conviction. *Id.* at 1118. The court affirmed the conviction for obstructing the entrance, but, consistent with the government's position, reversed on the failure to comply charge.

Now, for the present appeal. In May, 1996, Gilbert protested at the top of the steps of the Russell Building (within the restricted area) at least five times. Between May 8 and May 30, 1996, on five occasions, an FPO directed him to leave the steps, told him where he could obtain a permit to demonstrate and informed him that he could only demonstrate between the planters and Spring Street.

The five count Information charged him with violating 41 C.F.R. § 101-20.304 (failure to comply with the lawful direction of an FPO) on May 8, 10, 23, 29 and 30, 1996. These offenses are Class C misdemeanors or "petty offenses." The government is *not* asserting here that Gilbert was violating the injunction issued in *Gilbert I.*

Gilbert represented himself at the trial, with appointed stand-by counsel. A review of the transcript makes it clear that the trial judge had her hands full. Gilbert was found guilty on all five

counts and was sentenced to 30 days as to each count to run consecutively for a total of 150 days.

There is no question that Gilbert was demonstrating without a permit; there is likewise no question that on each of the five occasions (the dates of the five citations) he was advised that the rules on where protests and demonstrations could take place were now different from what they had been before the planters were installed.

Gilbert argues that since the previous injunction allowed him to demonstrate or protest all the way up to the portico of the Russell Building, he must still be allowed to do so, even though no one else is authorized to demonstrate or protest in that area, permit or no permit.

In this appeal, we must address whether the GSA policy is a constitutional restriction of First Amendment rights. This court has jurisdiction over an appeal from a final decision of a district court pursuant to 28 U.S.C. § 1291. Issues of constitutional law and statutory interpretation are subject to plenary review. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958-59, 80 L.Ed.2d 502 (1984); *United States v. Lawson,* 809 F.2d 1514, 1517 (11th Cir.1987).

The extent to which the government can control access to its property depends on the nature of the relevant forum. *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). There are three categories of fora, each with its own First Amendment analysis. The first category is traditional public fora, such as public streets and parks, which are subject to strict scrutiny. The government may enforce regulations as to time, place and manner of expression as long as the regulations are: (i) necessary to serve a compelling state interest; (ii) content neutral; (iii) narrowly tailored to serve a significant government interest; and (iv) open to ample alternative channels of communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Next is government-designated public fora, which are

likewise subject to strict scrutiny. Any restrictions must be content neutral and reasonable as to time, place and manner. *Id.* at 45, 103 S.Ct. at 954-55. Finally, non-public fora are reviewed for reasonableness as to time, place and manner, in light of the purpose the property is intended to serve. *Id.* at 46, 103 S.Ct. at 955-56; *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985). The regulation of this last category need not be narrowly tailored to serve a compelling governmental interest. *Id.* at 809, 105 S.Ct. at 3452-53.

At the heart of this issue is Mr. Gilbert's apparent belief that nothing has changed since 1991 when this court heard the appeal that we have now designated "*Gilbert I.*"

The area between the planters and portico is no longer designated a public forum. It was reasonable for the district court to conclude that the government properly exercised its right (indeed, in this case its duty) to safeguard the courthouse by imposing further restrictions. The government is not required to retain indefinitely the open character of a facility. *Perry,* 460 U.S. at 44, 103 S.Ct. at 954.

The GSA policy is constitutional. To satisfy First Amendment concerns, the policy must be viewpoint neutral and reasonable in light of the purpose the property is intended to serve. *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3452. The regulation need not be "the most reasonable or the only reasonable limitation," nor must it be narrowly tailored to serve a compelling governmental interest. *Id.* at 809, 105 S.Ct. at 3452-53.

Gilbert argues that the policy banning protests and demonstrations within the subject area is an unconstitutional burden on free speech because it imposes a burden on Gilbert's ability to convey his message. He states that the new policy slashes in half what had been a public forum and moves his protest a great distance from the entrance of the Russell Building. However, it has been

held that the "less restrictive alternatives" test is not relevant to the question of whether the regulation of the time, place and manner of the speech are reasonable. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

Congress has given the GSA the authority to "make all needful rules and regulations for the government of the Federal property under their charge and control ..." 40 U.S.C. § 101-20.000. The GSA must ensure that the space assigned to government agencies within government-owned buildings is safe and that employees and visitors are not exposed to unnecessary risks. 41 C.F.R. § 101-20.002.2(d).

Given the purpose of the Russell Building, and the ample space still available for protest, and the fact that the policy is viewpoint neutral (it applies to all demonstrations without regard to the content of their messages), the GSA policy is a reasonable time, place, and manner restriction.

Gilbert also contends that the terms of the GSA policy are vague in that the policy does not indicate which activities it applies to, and further contends that if the policy applies to all activities, it is overbroad.

Vagueness arises when a statute is so unclear as to what conduct is applicable that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). To hold the policy as unconstitutionally void for vagueness, we must find that ordinary people cannot "understand what conduct is prohibited" and that the regulation "encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).

The GSA policy applies to all persons who are required by the regulation to have a permit. The policy statement is attached to the permit application and, as such, is given to "any person or

organization desiring to use a public area."  41 C.F.R. § 101-20.101(z).  The policy reads:

> ... the demonstration must be held on the exterior side of the planters, an area which is currently known as a public forum.  Any demonstrations that are in violation of this rule ... are considered a threat to the security of the building and the U.S. Court System, thus appropriate action will be taken.

Persons of average intelligence would understand that if they wanted to use the plaza to demonstrate, they would have to get a permit and hold the demonstration in the specified area.  Gilbert was advised on at least five different occasions that he was violating the regulation.

> Under the overbreadth doctrine in First Amendment cases, litigants are

> permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).  Challenges are permitted to regulations that "delegate[ ] standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights."  *Id.* at 613, 93 S.Ct. at 2916.  The Supreme Court warned, however, that "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine.  It has been employed by the Court sparingly and only as a last resort."  *Id.* The overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.  *Id.* at 615.

Gilbert contends that the policy requiring demonstrations to be held between the planters and street is overbroad because it purports to apply to "all activities."  Yet this must be read in context;  the "activities" are those listed in the regulation where a permit is required, *i.e.* cultural, educational and recreational activities, and including demonstrations and activities which may lead to disturbances.

Since the application of the "overbreadth" doctrine is not favored by the courts, and in view of the regulation's list of those activities which require a permit, we hold that the policy is not

overbroad.

Gilbert also argues that, in view of the *Gilbert I* decision, neither the regulation nor the GSA policy is applicable to him, and therefore it was unlawful for the FPO to order that he remove himself from the area. This argument has no merit; had he applied for a permit, he still would not have been allowed to protest on the front steps of the building. 41 C.F.R. § 101-20.402(c) specifically instructs that all permits *involving demonstrations* are to be coordinated with the Chief, Law Enforcement Branch, prior to approval. The policy statement also refers to demonstrations.

For all of the foregoing reasons, we will affirm the judgment of the district court.

AFFIRMED.