Scott **BLEDSOE,** Kevin **Aplin,** and Cannabis Action Network, a Louisiana corporation, Plaintiff,

v.

**CITY OF JACKSONVILLE BEACH,** a Florida Municipal Corporation, Defendant.

No. 98-548-Civ-J-16(A).

United States District Court, M.D. Florida, Jacksonville Division.

June 25, 1998.

---

Gary S. Edinger, Gainsville, FL, Richard L. Wilson, Orlando, FL, for plaintiffs.

Stephen Stratford, Jacksonville, FL, Lamar Winegeart, III, Jacksonville, FL, for defendant.

## ORDER GRANTING INJUNCTIVE RELIEF

SCHLESINGER, District Judge.

This case is before the Court on Plaintiff's *Motion for Preliminary Injunction* (Doc. # 2).

### I. Procedural Setting

The Court heard oral argument for this case on June 19, 1998 at which time the Plaintiffs moved the Court to consolidate the preliminary injunction hearing with the dispositive trial. The Plaintiffs at the same time stated that they would not be attacking, and indeed did not have standing to attack, the City's policy in an "as applied" manner. The City of Jacksonville Beach objected to consolidation stating that there was a need for fact finding; however, it was unable to clearly articulate any examples of relevant questions of fact *vis a vis* the facial challenge. Because the Plaintiffs limit their complaint to a facial challenge, the issue before the Court is purely one of law and fact finding is not necessary to the Court's decision. The Court granted the Plaintiffs' Motion to Consolidate. The Plaintiff's *Motion for Preliminary Injunction* is **DENIED** as **MOOT**. This Order considers and **GRANTS** a **PERMANENT INJUNCTION**.

### II. Preliminary Consideration of Issue Endorsement

At the outset it should be made plain that this case is not about endorsement of the Plaintiffs' message; rather, this case is about the free dissemination of ideas. Chief Justice Rehnquist stated:

> At the heart of the First Amendment is the recognition of the free flow of ideas and opinions on matters of public interest and concern. The freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole.... The First Amendment recognizes no such thing as a "false" idea. As Justice Holmes wrote, "when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market...." [internal citations omitted]

*Hustler Magazine v. Falwell*, 485 U.S. 46, 51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The Court neither accepts nor rejects the Plaintiffs message but merely endorses its right to convey its message. Additionally, the City, by granting a permit to anyone, should not be viewed as having passed upon the content of the speaker's message and indeed is very rarely allowed to consider speech content. *See National Socialist Party v. Village of Skokie*, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977) (refusing to allow a city to consider the nature of a speaker's message in its permitting considerations); *Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515 (11th Cir.1985) (refusing to allow a city to consider the nature of a speaker's message in its permitting considerations). However, it is possible to have a valid permitting system as long as it is content neutral relating to time, place and manner. *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

### III. Facts

The Plaintiffs in this case, the Cannabis Action Network, Scott Bledsoe and Kevin Aplin, desire to hold a rally in the City of Jacksonville Beach on July 11, 1998. The stated purposes of the Plaintiffs' proposed

rally are three: 1) to generate public support for the Plaintiffs' efforts in changing both United States and Florida law prohibiting the sale, possession and use of marijuana; 2) public education concerning the beneficial uses of marijuana; and, 3) fund raising for Plaintiffs' continuing efforts. The Plaintiffs state that the rally will consist of speeches and fund raising souvenir sales (including books and bumper sticks).

The Plaintiffs desire to hold their rally in an area of Jacksonville Beach referred to as the Seawalk Pavilion. The Seawalk Pavilion is a portion of publicly owned property frequently used, with permitting from the City of Jacksonville Beach, for public gatherings, rallies, and festivities. The Pavilion has minimal utilities and structures designed to facilitate such gatherings. The area is conveniently located with reference to all parts of the City and is roughly rectangular in shape. It has as its eastern boundary the Atlantic Ocean and the other three sides are bounded by private businesses, the nature of which is primarily the sale and dispensation of alcoholic beverages and restaurants.

### A. Permitting Requirements

Before a person or group is allowed to use the area, they must obtain a permit from the City. The City has a written policy regarding the granting of permits which is encompassed in its "Special Events Policy" ("Policy") which the City Council adopted on February 2, 1998. One component of the permitting requirement is the following:

F.  General Requirement for Special Event Permit on City Facilities

1.  Special Events may be approved by the Special Events Committee if [sic] the following criteria is met:

a.  Events [sic] promote and advertise Jacksonville Beach.

b.  Events [sic] which promote a positive image of the City.

c.  Events [sic] which promote a family-oriented environment. Family-oriented environment is defined as a safe, clean area with activities which encourage attendance by either families, children and [sic] senior citizens.

. . . .

13.  The Special Events Committee may reject any application which does not meet the above criteria established for special events, or for any other reason including, but not limited to the following:

. . . .

c.  The purpose of the event is not for the entertainment of the general public.

Policy, pp. 4–6 ("Policy"). The Special Events Committee is "defined" as the following:

J.  Special Events Committee—a committee, appointed by the City Manager, and composed of the assistant City Manager as chairperson; and the Department Directors of the Park and Recreation, Police, Fire, and Planning and Development Departments.

Policy, p. 2. Furthermore, the Jacksonville Beach Police Chief, under the Policy, is also granted discretion to determine how many police officers may or may not be required at an event:

C.  Law Enforcement Requirements for all Events on City Facilities

. . . .

2.  Additional police security personnel may be required based on the type of event, number of participants and other factors. The need for additional personnel will be determined by the Chief of Police after reviewing the special event permit application. Arrangements for these types of services may be made directly by the special event organizer and Police Department.

Policy, p. 3. Each officer is guaranteed a minimum number of paid hours for any special event for which they are required by the Police Chief:

C.  Police Security Pay Schedule For Special Events

1.  The minimum charge for security provided at a permitted special event by the City of Jacksonville Beach Police shall be based on three (3) hours per officer per event.

. . . .

3.  Hourly Fees:

a. All off-duty jobs require a three (3) hour minimum payment per officer.

Policy, p. 13. The pay schedule is as follows:

| Off-duty work | Per Officer Hourly Rate | Supervising Hourly Rate Event Requiring Three (3) or more officers |
|---|---|---|
| One-time or 1st time event | $25.00 | $30.00 |
| Recurring Events | $20.00 | $24.00 |
| Events held on City Recognized Holidays | $30.00 | $36.00 |

Policy, p. 14. The City also charges a rental fee to use its public property:

B. FACILITY RENTAL RATES

| | For Profit Fee | Non–Profit Fee |
|---|---|---|
| Sea Walk Pavilion | $200/DAY | $100/DAY |
| Oceanfront Parking Lot | $200/DAY | $100/DAY |
| North or South Parking Lots | $100/DAY | $ 50/DAY |
| Grassy Area | $100/DAY | $ 50/DAY |
| 5th Avenue Parking Lot | $200/DAY | $100/DAY |

1. When applicant proposes to control access and use of parking the lot for the duration of the special event, and has been granted approval by the City Council to charge parking fees, the city will receive thirty-five percent (35%) of the net total parking fees collected in addition to the facility rental fee.

2. The facility rental fee includes access to electricity available at the site, city assistance in hanging of event banners, barricades, trash containers. Should power needs exceed the exiting power capacity of the site, the cost of auxiliary power will be the responsibility of the event organizer/producer.

Policy, p. 12.

Also included in the policy is a scaled (for the number of people that will attend) security deposit requirement (Policy, p. 12) and a $1 million insurance policy (with the City to be named additional insured) requirement (Policy, p. 3–4).

IV. Standard for a Permanent Injunction to Issue

The standard for issuance of a permanent injunction is essentially the same as that for the issuance of a preliminary injunction, except that a plaintiff seeking the former relief must show actual success on the merits, rather than a mere likelihood of success on the merits. *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). In order to be entitled to permanent injunctive relief, the Plaintiffs must satisfy the following three criteria: (1) violation of the applicable constitutional standard by the Defendant; (2) continuing irreparable injury to the Plaintiffs in the absence of an injunction; and (3) lack of an adequate remedy at law. *See Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982); *Environmental Waste Reductions, Inc. v. Reheis,* 887 F.Supp. 1534, 1570 (N.D.Ga.

1994); *Diamond Waste, Inc. v. Monroe County, Georgia,* 869 F.Supp. 944, 947 (M.D.Ga.1994).

## V. First and Fourteenth Amendment Analysis

The Plaintiffs in the case *sub judice* argue that the Policy is unconstitutional as it violates their free speech rights as guaranteed to them by the First and Fourteenth Amendments to the Constitution of the United States. The Plaintiffs specifically attack the policy as having a "chilling effect" on their free speech rights because the Policy is content specific. Furthermore, the Plaintiffs attack the insurance requirement. Finally, the Plaintiffs complain that the discretion left to the Police Chief is unconstitutional. The Plaintiffs admit that the $100 rental fee for utility payments is not at issue.

■ The City of Jacksonville replies to these allegations by stating that because the Plaintiffs have not been injured they do not have standing to complain and the Court does not have jurisdiction to hear this case. Additionally, the City states that the Policy is merely a content neutral, time, place and manner restriction which is constitutionally valid. *Forsyth County,* 505 U.S. at 136, 112 S.Ct. 2395 (discussing time, place and manner restrictions). The City argues in support that the Policy is always construed so as to always grant permits but for a conflict with another event that had been previously scheduled. That is, the City argues that it would only deny permits in cases when a prior event is scheduled; therefore, their regulation is content neutral and reasonable as to time, place and manner. A non-neutral regulation must be narrowly tailored to meet a compelling government interest and this analysis is discussed further below. *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

### A. Standing

■ The first argument presented by the City is easily dispensed with. The City's argument that the Plaintiffs in this case do not have standing is not borne out by the case law on this subject. In *United States v. Gilbert,* 130 F.3d 1458 (11th Cir.1997) the Eleventh Circuit held that a challenge to a regulation restricting speech may be made on its face. The purpose of allowing facial attacks is to protect the rights of those who would otherwise come forward to exercise their First Amendment right.

The City points to *Hallandale Professional Fire Fighters, Local 2238 v. City of Hallandale,* 922 F.2d 756 (11th Cir.1991) as requiring persons who wish to attack a law as violative of the First Amendment to show some form of concrete injury. Specifically, it argues that a subjective chill is not an adequate substitute for a showing of objective harm, or a threat of a specific future harm. The City suggests that the Court is without jurisdiction to decide this case without actual harm because there is no case or controversy. The City would have us require the Plaintiffs to first apply for a permit and be turned down (thus they would be harmed) and thereby gain standing. This is a facile suggestion which would facilitate the unlawful conduct's evasion of judicial review.

The City's suggestion that *Hallandale* requires actual harm is a misstatement of *Hallandale.* Reading past the point at which the Defendant draws its support from *Hallandale,* the *Hallandale* court limited the issue of concrete harm to situations in which the allegedly violative rule or statute is in the employment context. The *Hallandale* court stated:

> [The two cases cited by the *Hallandale* parties] allowed facial attacks on local ordinances of general application by plaintiffs against whom the ordinance had not been enforced. The fact that ... [the cases] involved ordinances of general application rather than a public employee policy probably produced a more lax application of the injury requirement than would be appropriate in this case.

*Id.* at 761. The *Hallandale* court then states in footnote five that:

> The realm of protected speech and conduct for public employees is much narrower than that for the general public. And we believe that the case law shows this narrowness affects the question of justiciability as well as the question of merit in cases that are justiciable. Put differently, the broader the First Amendment right and, therefore, the more likely it is that a gov-

ernmental act will impinge on the first amendment, the more likely it is that the courts will find a justiciable case when confronted with a challenge to the governmental act. [internal citations omitted]

*Id.* at 762 n. 5. *See Thornhill v. State of Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (discussing standing without harm in First Amendment contexts); *Naturist Society, Inc. v. Fillyaw,* 958 F.2d 1515 (11th Cir.1992) (discussing the presence of standing for First Amendment facial attacks). The Court thinks that this argument is without merit.

### B. Type of Speech and Type of Forum

■ The Defendant in this case does not argue that the Pavilion is not a public forum. Furthermore, the Defendant does not contend that the Cannabis Action Network Incorporated, Bledsoe and Aplin are, in fact, attempting to convey commercial speech at the proposed rally. As the public forum issue was not raised at hearing, the Court will only address the issue cursorily by stating that if the issue had been raised, it would have found that the Pavilion is the type of locale used as a public forum. Additionally, although purportedly a corporation under Louisiana law, the Cannabis Action Network, is not primarily aimed at moneymaking but instead at furthering a political agenda. Therefore, the Policy would not have been suitable for analysis under the lessened review standard used for commercial speech.

### C. Prior Restraint

Regulations which purport to control speech are generally referred to as "prior restraints." The First Amendment of the United States Constitution, which is applied to the States of the United States through the Fourteenth Amendment, generally prohibits prior restraints on Free Speech Rights. However, not all prior restraints on Free Speech Rights are invalid. *See generally* John E. Nowak and Ronald D. Rotunda, *Constitutional Law* §§ 16.7(b), 16.46, 16.47(c), (4th ed.1991) (discussing Constitutional regulation of Free Speech).

Public forums are suitable for governmental regulation as to first amendment speech when they are content neutral reasonable time, place and manner restrictions. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Heffron v. International Society of Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). In *Gilbert* the Eleventh Circuit specifically stated that the test for government regulation of time, place and manner is: 1) necessary to serve a compelling state interest; 2) content neutral; 3) narrowly tailored to serve a significant government interest; 4) open to ample alternative channels of communications. *Gilbert,* 130 F.3d at 1461.

■ In this instance, for reasons explained below, the restrictions are not content neutral and people have a right to be free from state discrimination based on the content of their speech. *Chicago Police Department v. Mosley,* 408 U.S. 92, 96–98, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Duke v. Massey,* 87 F.3d 1226, 1232 (1996). Regulation that controls speech content is to be reviewed to assure that it is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Perry Educ. Assn. v. Perry Local Educators Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *see also Reno v. American Civil Liberties Union,* 521 U.S. 844, ——, 117 S.Ct. 2329, 2345, 138 L.Ed.2d 874 (1997) (discussing analysis of content based restrictions); *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (discussing the applicability of the First Amendment to a homosexual group wishing to take part in a public parade).

■ In addition to the requirements for time, place and manner restrictions, the permitting body must also show that it has created a system that provides certain procedural safeguards. Those safeguards are:

1) The burden of instituting judicial proceedings and proving that material is unprotected must rest on the censor;

2) Any restraint prior to a judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo; and

3) A prompt final judicial determination must be assured.

*Freedman,* 380 U.S. 51, 59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). In instances where the law under review places restrictions on classes of "expressive" businesses (generally sexually oriented entertainment businesses), the first requirement may be done away with. *Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1548 (11th Cir.1993). This exception is not available here. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 560, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (requiring compliance with the Freedman procedural safeguards in public forum permitting systems); *Michel–Trapaga v. City of Gainesville,* 907 F.Supp. 1508, 1511 (M.D.Fla.1995) (striking down similar permitting system as unconstitutional). In addition to failing to meet the *Gilbert* standards, the Policy fails to comply with the requirements of *Freedman.* This failure is discussed below.

### 1) Content Neutrality

■ The traditional method of determining whether a regulation is content neutral or content specific is to look at the intent behind the regulation. That is, determine whether the contested regulation was drawn with the intent of controlling harms not relative to the message, or if the regulation was created because of a disagreement with the message conveyed through the speech. *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746.

■ In this case the City describes in its policy those types of activities that may be permitted at the Pavilion. The Policy requires that the person seeking a permit for a rally or event at the Pavilion, or on other city property, do so only if the event will advertise the City, promote the City, or promote what may be loosely termed "family values". Additionally, the City may disallow, at its discretion, a permit for any reason including the fact that the event is not for the purpose of entertaining the public (the Court notes that certain of these requirements may be internally inconsistent). This type of content idea filtering, although quaint in a Mayberry R.F.D. aspirational way, takes on an Orwellian aspect when applied in the real world.

The procedure in place refers all questions of permitting to a committee headed by the assistant city manager and composed of various city department heads. Beyond the broad requirements of the Policy discussed above, the Policy is silent as to the parameters of the committee's powers c٢ items that it may consider when determining whether to grant a permit. There is no internal guidance. Nothing in the Policy supports the City's proffered argument that the committee is prohibited from considering content when determining whether to issue a permit. The permit actually requires the committee to consider the content of the proffered speech.

■ The City's argument that the committee never applies content control in its permitting process seems almost completely devoid of persuasive value. Perhaps if the Policy had been in place for decades and every conceivable type of rally, from Pat Robertson to the Grand Wizard of the Ku Klux Klan, had been permitted at the Seawalk Pavilion, then this argument would carry some weight. However, since the Policy states on its face that it has only been in existence since February 1998, this argument seems to be poorly-founded. Furthermore, this type of argument has been considered before and found insufficient. *Nationalist Movement,* 505 U.S. at 133 n. 10, 112 S.Ct. 2395; *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The Supreme Court has noted that, "The threat of sanctions may deter ... almost as potently as the actual application of sanctions." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *San Juan Liquors, Inc. v. Consolidated City of Jacksonville, Florida,* 480 F.Supp. 151 (M.D.Fla.1979). In this case the sanction would be the prohibition of the event. The fact that the City has never used the Policy as a filter is a Constitutionally insufficient justification.

■ The Court is unable to see how the City's Policy can be anything other than content based regulation. Applying the *Rock Against Racism* analysis, the Court sees no intent to control harms that are unrelated to the message of the speech but, instead, sees a regulation that directly analyzes the message of the offered speech. The City has

failed to meet the burden that is constitutionally mandated when a regulation is content specific. The Supreme Court in *Perry* explained that a content based regulation is to be reviewed under the strictest of scrutiny. In order to pass constitutional muster, the Policy must be necessary to serve a compelling state interest and it must be narrowly drawn to achieve that end. The City has not explained its need to filter the speech presented at the Pavilion, i.e. no compelling state interest. Additionally, the Policy is too broad in that it affects all speech that does not promote a City mandated value, i.e. not narrowly tailored. The regulation is too broad and again fails strict scrutiny for this reason.

## 2) Police Discretion

The Court notes, prior to beginning this discussion, that it has no reason to believe that the Jacksonville Beach Police Chief is anything other than a fine law enforcement officer. However, the Plaintiffs complain that the Police Chief has unconstitutionally broad discretion to decide permitting matters. The Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), that the protection of constitutional rights should not be left to the discretion of law enforcement officers (nor judges for that matter), however well meaning they may be. Discretion creates non-compliance with the constitutional requirement of narrow tailoring, which is discussed above. The vagueness that arises from delegating discretion to law enforcement officers was described by Mr. Justice Marshall:

A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.... [W]here a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were

clearly marked [internal citations and quotes omitted]

*Id.* at 109, 92 S.Ct. 2294.

The Police Chief is granted discretion by the Policy to determine when a police presence will be required at an event and this presence will be paid for by the event sponsor. The Chief is allowed to review any requested permit and require the event sponsor to have any number of officers that he may designate. In investigating the permissiveness of this discretion, the Court foresees where the police chief could decide that he does not agree with a particular speaker and, therefore, require a small army of police officers to be present. With each officer being paid a minimum of $ 20 for at least three hours, the event could be taxed out of existence before the first speaker takes the stage. This section fails the test of *Grayned* and its progeny because it is overbroad and vague.

### i) Heckler's Veto

It could be argued that the police chief would only require a police presence for those events that are likely to result in some form of civil danger. A civil danger in this case being a speaker's unpopular message leading to a possible violent reaction from the gathered crowd, not "fighting words" or "incitement to imminent lawless violence", but simple unpopularity. The result of the speaker being required to bear the cost of a police presence results in a "heckler's veto." The Eleventh Circuit spoke directly to this type of private imposition of a public control problem in *Nationalist Movement v. Forsyth County, Georgia*, 92 F.3d 1135 (11th Cir. 1996), *aff'd*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The Eleventh Circuit stated that the private speaker is not to be prevented from speaking by the imposition of a public cost on the private speaker. *Forsyth County* at 142, 112 S.Ct. 2395. *See also Reno*, 117 S.Ct. at 2348 (discussing a heckler's veto due to age); *Chabad–Lubavitch of Georgia v. Miller*, 976 F.2d 1386 (11th Cir. 1992), *rev'd on other grounds*, 5 F.3d 1383 (11th Cir.1993) (discussing an "obtuse" heckler's veto). The courts have long been aware

of a heckler's veto and have long stated that the heckler's veto is not to be tolerated.

### ii) Freedman Procedural Safeguards

██ This policy fails not only because it is impermissibly broad and vague but also because it fails to provide the procedural safeguards of *Freedman*.[1] Generally, in a permitting system, in order to protect First Amendment rights, a regulation must provide internal time limits within which the regulating body must act. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (discussing time limits established in *Freedman* within which permitting decision must be made); *See Wolff v. City of Monticello*, 803 F.Supp. 1568 (D.Minn.1992) (ninety day time limit okay for licensing); *Ellwest Stereo Theater, Inc. v. Boner*, 718 F.Supp. 1553, 1571 (M.D.Tenn. 1989) (sixty day time limit okay for licensing). The Supreme Court has noted that regulations which fail to provide time limits allow a body to "sit" on a request. A lack of a definite time period serves both to allow the message to be "killed" through inaction on the permit and also makes it more difficult for a court to review that action/inaction. *Freedman*, 380 U.S. at 59, 85 S.Ct. 734. The Policy at question here does not provide any time limits within which the committee must act on a permit application. At hearing, the City stated that all permits are granted within one day. However, the Court, again, is unable to determine this from a careful reading of the Policy itself.

██ In addition to the requirement of action on the permitting request, another problem exists. The Policy has no internal time limit within which the issuing body must notify the permit petitioner of the issuing body's final decision (including internal appeals). Without prompt notification the aggrieved part may not be able to bring his complaint to the courts in time to prevent harm to his First Amendment rights. *Redner v. Dean*, 29 F.3d 1495, 1500–03 (11th Cir.1994) (discussing the need for prompt

judicial review). Generally, all permitting decisions (all levels of decision making) must have internal time limits which allow the person desiring the permit to seek prompt judicial review. *Id.*

It should be noted that the implementation of permitting time limits alone will not cure the Policy's problems discussed above. The Eleventh Circuit stated in *Church of Scientology*, 2 F.3d at 1548 that:

> The requirement of definite and precise standards to guide regulations of speech is distinct from the procedural requirements imposed by *Freedman* ... and its progeny.... For whether speech is prohibited before the exercise of judicial review functions or after, the effect of such ban is to impose a prior restraint. Moreover, a vague law is not rendered more precise by virtue of a court having passed upon its application to particular facts. Rather, such a process merely shifts the exercise of impermissibly broad discretion from executive officials to judges, a shift that has no significance in First Amendment jurisprudence.

It is clear that the City has failed to provide for adequate time limits as required by prongs two and three of *Freedman*, in addition to failing to comport the permitting process with the standards allowed for a proper time, place and manner restriction. *See Redner*; *Hall v. Board of School Commissioners of Mobile County, Alabama*, 681 F.2d 965 (5th Cir.1982). For this reason, the City's policy is again constitutionally impermissible as it fails to comply with the time restraint requirements set forth in prongs two and three of *Freedman*.

Finally, the Policy also fails because it does not comply with the first *Freedman* requirement of placing the burden of instituting judicial review on the City (in a proceeding in which the City would carry the burden of proof). *Freedman*, 380 U.S. at 59, 85 S.Ct.

---

1. As noted before, these safeguards are:
   1) The burden of instituting judicial proceedings, and proving that material is unprotected, must rest on the censor;
   2) Any restraint prior to a judicial review can be imposed only for a specified brief period

   and only for the purpose of preserving the status quo;
   3) A prompt final judicial determination must be assured.

   *Freedman*, 380 U.S. at 59, 85 S.Ct. 734.

734. In short, the Policy fails all parts of *Freedman.*

### iii) Insurance Requirement

Because the Plaintiffs made a motion at the hearing that the trial and the preliminary injunction be consolidated, stating that no facts needed to be determined, their are insufficient facts in the record to support a finding with regard to the insurance requirement. As such, the Court chooses not to rule on the question of insurance at this time because it is factually premature.

### iv) Security Deposit

█ The Policy *sub judice* requires a person seeking a permit to pay the City a security deposit based on the number of people that are projected to attend. The Supreme Court has negatively addressed the issue of placing monetary burdens on speakers with regard to the number of people that are projected to attend. The Supreme Court stated in *Nationalist Movement* that ordinances which look at the type of speech and then apply a scaled fee to that attendance projection are, in effect, placing a tax on the speech based on its content. In example, a lone speaker with a particularly unpopular message may be prevented from speaking simply because his speech is unpopular and therefore likely to draw a large crowd. *See generally Central Florida Nuclear.*

The security deposit in this case charges fifty dollars even if only one person is expected to attend. The Court does not think that this would pass even a rational basis test, let alone the compelling interest/narrowly tailored requirement. This is a content regulation in a nontraditional guise and is not to be tolerated.

### v) Rental Fee

The Plaintiffs stated at oral argument that they did not contend that the rental fee was unconstitutional. Since the Plaintiffs do not quarrel with this portion of the Policy, the Court will not address the issue.

### vi) Conclusion

The City's Policy with regard to permitting events at the Seawalk Pavilion does not pass constitutional muster. The placement of a prior restraint on First Amendment rights is, in certain instances, constitutionally acceptable. In order to be constitutionally acceptable, the prior restraint must be content neutral. Here, the Policy restrains based upon message content. This prior restraint with regard to content control requires that the City's Policy pass strict scrutiny, that is, a compelling state interest carried out through the medium of a narrowly tailored regulation that has no less burdensome alternative must be present.

Moreover, for the Policy to be acceptable it must not leave too much discretion in the hands of law enforcement (or bureaucratic) personnel. Leaving too much leeway renders the statute unconstitutionally vague in that it does not provide the average person with notice so as to comport their behavior to that which is legally acceptable.

Finally, the Policy fails to state, internally, the time limits within which the Committee administering the Policy must act. Failing to provide internal time limits creates a situation in which a person may be deterred ("chilled") from exercising their First Amendment Rights. This chilling effect arises because the potential message disseminator sees the administrator's ability to draw out the process of permitting beyond the opportunity for the spreading of the potential speaker's message. In effect, the drawing out kills the message. Additionally, the policy fails to require the City to seek judicial review and maintain the status quo, if it denies a permit.

## V. Standards for Permanent Injunctive Relief Met

The standard for issuance of a permanent injunction is essentially the same as that for the issuance of a preliminary injunction, except that a plaintiff seeking the former relief must show actual success on the merits, rather than a mere likelihood of success on the merits. In order to be entitled to permanent injunctive relief, the plaintiffs must satisfy the following three criteria: (1) violation of the applicable statutory or regulatory authority by the defendants; (2) continuing irreparable injury to the plaintiffs in the absence of an injunction; and (3) lack of an adequate remedy at law.

In the case at bar, as discussed above, the Plaintiffs have shown that City has failed to comport its behavior with that required by the Constitution. Secondly, the Supreme Court stated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) that the loss of First Amendment freedoms constitutes "irreparable harm" and the Court is satisfied in this instance the that Plaintiffs will be irreparably harmed if their power to speak freely is not protected. Finally, it is difficult to place a monetary value on the right to free speech. Certain ideals upon which the United States was founded are simply too sublime and no adequate remedy would exist at law for the Plaintiffs.

The Court finds that the standard is met for the issuance of a Permanent Injunction against the City of Jacksonville Beach.

It is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiff's Motion for Preliminary Injunction is **DENIED** as **MOOT.**

2. The City of Jacksonville Beach is **ORDERED,** if Plaintiff files an application for permit by July 1st, to Make a **FINAL DETERMINATION, GRANTING OR NOT GRANTING** Plaintiff's Permit Application, and **NOTIFY** the Plaintiff by JULY 5, 1998.

3. Permanent Injunction is **GRANTED** and the City of Jacksonville Beach is hereby **ENJOINED** from applying the following sections of its Policies and Procedures For Special Events promulgated on February 2, 1998.

   1. IV(C)(2)

   2. IV(F)(1)

   3. IV(F)(13)(c)

   4. VII(A)

   5. VII(C) with regards to events not involving alcohol.

Furthermore, until such time as the City provides for an internal time limit on permitting decisions, the City is **ENJOINED** from **NOT RENDERING** a **FINAL PERMITTING DECISION** and **NOTIFYING APPLICANT** in **MORE THAN TEN BUSINESS DAYS** (that is, a final decision shall be made by the close of business on the tenth business day after submission of a permit application, exclusive of the day of submission).

4. The **CLERK** is **DIRECTED** to **CLOSE** this File.